## THE STATE  v.  STELLA  MARTIN  LOVELL, Appellant.

**Division Two, June 20, 1911.**

1. **EVIDENCE: Statement Made by Deceased in Defendant's Presence.** Where a physician had called at the house where the shooting occurred soon after defendant had taken a revolver from a drawer and shot deceased, and inquired what was the matter, and defendant replied she had shot deceased, but it was an accident, a statement in her presence and hearing made by deceased, "She knows better than that," and not denied by her, is admissible in evidence. And the facts of this case show the statement was made in her hearing.

2. ————: **Objection Sustained: No Offer of Proof.** If an objection to a question is sustained, there should be an offer of proof by the party against whom the ruling is made.

3. ————: **Improper Answer.** An improper answer by a witness should be followed by a motion to strike out, to be available for review on appeal.

4. ————: **Prior Quarrel and Threats: Felonious Intent: Accident.** Testimony that defendant and deceased had quarreled shortly before the shooting, and that during the quarrel defendant was angry and used vile and profane language and threatened to tear down deceased's place of business unless he complied with her demands, is competent as tending to show that the fatal shot was fired with felonious intent, and not by accident as defendant contends.

5. ————: **Irrelevant Matter.** Testimony that the man who was in charge of defendant's house after her arrest for shooting deceased therein, was seen near the house with a pistol the next morning after the shooting, in no manner connecting the defendant with the man's possession of the weapon, had no place in the case, and ought not to have been admitted; yet as it is conceded that defendant had a pistol at the time of the shooting and fired the fatal shot, such testimony could not have prejudiced the defendant, and is not reversible error.

6. ————: **Part of Conversation: No Proffer of Balance: Non Prejudicial Error.** When the State introduces in evidence statements made out of court by the defendant, the entire conversation thereby becomes admissible; and where the State had shown that defendant in the county jail on the night of the shooting said she shot to kill and she hoped she had killed

"the s— of a b—," it was error to deny to her the privilege of narrating other portions of her conversation on that occasion. But where she testified that it was the deputy sheriff to whom she referred and not the deceased, and no offer of proof of the balance of the conversation was made by her counsel, the error will not on appeal be held to be prejudicial.

7. DYING DECLARATION: Necessary Showing. A dying declaration, to be competent as evidence, must be made under the belief that death is impending and that there is no hope of recovery. Where defendant was fatally shot through the body and bladder, suffered greatly from hemorrhage and shock, and died within forty-eight hours; had been informed by his physician that he could not recover, and had said to his father he was going to die, a declaration signed by him after it had been reduced to writing by an attorney, is competent evidence.

8. ———: Prejudicial Words in Same. A statement in the dying declaration that defendant fired three shots at deceased "without any cause known to him," is favorable to defendant rather than prejudicial, where the defense is that the shooting was accidental.

9. ACCIDENTAL HOMICIDE. The evidence in this case, where the defense was that the shooting was accidental, was sufficient to sustain a verdict convicting defendant of murder in the second degree for having shot her paramour after drinking and quarreling with him for two or three hours in her own house.

Appeal from Bates Circuit Court.—*Hon. Charles A. Denton,* Judge.

AFFIRMED.

*W. O. Jackson* and *Thomas J. Smith* for appellant.

(1) The court erred in permitting the defendant to prove by the witness Dr. Chastain that defendant stated to him that she shot deceased by accident, and, then, over the defendant's objection, permitting the witness to testify that the deceased, while the defendant was in the same room, said to him, "She knows better than that," and that defendant made no reply at all. The witness admitted that he did not know whether defendant heard the statement of deceased or not. 1 Greenleaf on Ev. (14 Ed.), Sec. 197; State v.

Glahn, 97 Mo. 679; State v. Mullins, 101 Mo. 517; State v. Murray, 126 Mo. 615; State v. Swisher, 186 Mo. 10. (2) The court erred in permitting the witnesses McGinnis and McManus to testify to alleged conduct and statements made by the defendant prior to the time of the shooting. Such statements being in no sense a threat against the deceased, but prejudicial. State v. Jaeger, 66 Mo. 180. (3) The court erred in permitting the witness Thomas to testify to having seen one Klepper, who is shown to have had charge of the defendant's house after she was arrested, to have in his possession a pistol near the defendant's house on the morning following her arrest; there being no evidence at all that he had been in the house at the time, that he had procured the pistol from the house or that he was there by direction of the defendant, or that the defendant knew of his being there or of his having a pistol in his possession. Even if Klepper had been in a conspiracy with defendant to murder deceased, which is not charged, what he did next day after the shooting, in defendant's absence, was not competent against the defendant. State v. Swain, 68 Mo. 601; State v. Elkins, 101 Mo. 344; State v. Duncan, 64 Mo. 266; State v. Roberts, 201 Mo. 728. (4) The court erred in refusing to permit the defendant to testify as to the conversation had with Chambers at her house on the night of the shooting; said Chambers had testified on behalf of the State as to what the conversation was. The defendant had a right, therefore, to give the whole conversation which occurred at the time. The court also erred in refusing to permit defendant to testify as to the conversation which she had with Babe Card at the jail on the night following the shooting at her house. The State having introduced a part of the conversation, the defendant had a right to have the whole conversation go to the jury. 1 Greenleaf on Ev. secs. 201-202; Best's Prin. of Ev., p. 511; Underhill on Ev., sec. 80; State v. Martin, 28 Mo. 530; State v.

Branstetter, 65 Mo. 149; State v. Napier, 65 Mo. 462; State v. Hayes, 78 Mo. 319; State v. Young, 119 Mo. 495. (5) The evidence all shows the deceased was told, prior to the time he made his ante-mortem statement, that the wound was serious and most likely would prove fatal, unless he submitted to an operation. Whereupon he consented to the operation being performed. This statement, not having been made in the belief that death was inevitable and then imminent, was not competent. Greenleaf on Ev. sec. 156; Underhill on Ev. sec. 101; State v. Simon, 50 Mo. 370; State v. Ridder, 90 Mo. 54; State v. Partlow, 90 Mo. 608; State v. Elkins, 101 Mo. 341; State v. Johnson, 118 Mo. 491; State v. Wilson, 121 Mo. 434; State v. Craig, 190 Mo. 641; State v. Kelleher, 201 Mo. 614; People v. Hodgdon, 55 Calif. 73. (6) That part of the ante-mortem statement to the effect that defendant, "without any cause known to him," fired the shots, is not a statement of a fact occuring at the time, but is the conclusion of the witness, and was incompetent in any event and prejudicial. State v. Draper, 65 Mo. 335; State v. Elkins, 101 Mo. 450; State v. Barker, 172 Mo. 202; State v. Horn, 204 Mo. 548.

*Elliott W. Major,* Attorney-General, and *John M. Dawson,* Assistant Attorney-General, for the State.

(1) Appellant complains as to the action of the court in refusing to permit defendant to testify as to the conversation that she had with Chambers at the jail on the night following the killing at her house. A perusal of the appellant's testimony would show that she was permitted to testify in full as to what happened on the night of the killing and after the killing, as well as to what was said at the jail. No reversible error was committed by this ruling of the court. All the witness could have done was to deny the conversation, and she, in effect, had done that. The court per-

mitted the appellant to cross-examine witnesses Mc-Manus and Winn. State v. Branstetter, 65 Mo. 156; State v. White, 189 Mo. 339. (2) The rule that admits dying declarations and ante-mortem statements is that they are declarations made in extremity when the parties are at the point of death and every hope of this world is gone, when every motive to falsehood is silenced, and the mind is induced to speak the truth. The form of a dying declaration is immaterial so that it clearly shows that it was made under a sense of impending dissolution. State v. Nocton, 121 Mo. 550. It is the impression of almost immediate dissolution and the rapid succession of death in point of fact that renders the testimony admissible. 1 Greenleaf on Ev. sec. 158; 3 Russell on Crimes (9 Am. Ed.), 250; 9 Am. & Eng. Ency. Law, 108; State v. Bowles, 146 Mo. 6; State v. Craig, 190 Mo. 338. After the consideration of all the evidence in this case with reference to the condition of the deceased at the time he made the ante-mortem statement, the court can arrive at no conclusion other than that the deceased made the ante-mortem statement under a belief of impending dissolution, and after he had abandoned all hope of recovery. This seems to be the rule under which this sort of evidence is admitted. State v. Elkins, 101 Mo. 350; State v. Colvin, 226 Mo. 488. The fact that the deceased did not die for some little time after his formal dying declaration had been written and signed does not effect its admissibility, if at the time of making it he believed that death was impending. State v. Hendricks, 172 Mo. 654; State v. Parker, 172 Mo. 203; State v. Vaughn, 152 Mo. 73; State v. Sexton, 147 Mo. 89. From the time the deceased was taken back from the appellant's porch and put on the bed he was considered *in extremis*. The evidence shows that he said he was all in. He soon began to bloat, was exhausted and weak. At the time he made the statement he was advised by his physicians that he could not live, and

he knew it. State v. Garth, 164 Mo. 563; State v. Brown, 188 Mo. 451.

KENNISH, P. J.—Under an information charging her with murder in the first degree for having shot and killed one Duke Benefield on the 20th day of December, 1909, appellant was tried in the circuit court of Bates county at the February term, 1910, convicted of murder in the second degree, and her punishment assessed at imprisonment in the penitentiary for a term of ten years. She appealed to this court.

The evidence for the State tended to show the following facts:

At the date of the homicide and for some time prior thereto the defendant lived alone in a small cottage in the city of Butler, she and her husband having been separated for a number of years.

The deceased, an unmarried man about thirty-three years of age, resided at Rich Hill, where he was employed as a bartender. He had formerly lived in Butler, and while living there, before the defendant and her husband separated, there were frequent clandestine meetings between him and the defendant. The defendant's husband left her on account of the attentions shown her by the deceased and afterwards instituted a suit for divorce. The divorce suit was still pending at the time of the homicide. After the separation, both while the deceased lived in Butler and after he moved to Rich Hill, he frequently went to the home of the defendant and remained there with her during the night.

On December 20, 1909, the deceased was in the city of Butler attending a political convention. Early in the afternoon he sent some beer and whiskey to the home of defendant and notified her that he would be down that evening and would spend the night with her. He also arranged for an oyster supper at defendant's house that evening and invited a woman named Nell

Golden and a man known as "Dusty" Laster to attend the supper. Early in the evening the deceased, Laster and Nell Golden went to the defendant's home, taking with them such things as they wished to have prepared for the supper. While the defendant was cooking the supper, during the meal and later in the evening there was considerable drinking, especially upon the part of the defendant and the deceased. Neither Laster nor Nell Golden drank enough to affect them to any extent, but the defendant and the deceased both became very much intoxicated.

In the course of the evening the defendant and the deceased had several quarrels, but at the time of the shooting of deceased they were not quarreling and to all appearances had forgotten their differences.

Between ten and eleven o'clock the deceased began to undress and insisted that the defendant go to bed with him. He sat down on the edge of the bed and continued taking off his clothes. Laster and Nell Golden announced that they were going to leave and were preparing to take their departure when defendant walked to a dresser that was in the room, took a revolver from a drawer, faced the deceased and discharged the revolver, the bullet striking him in the abdomen and inflicting a wound from the effects of which he died the following day.

The bed on which the deceased was seated at the time he was shot was in the southwest corner of the room. The head of the bed was to the west. The dresser was in the northwest corner of the room. There was also a stove in the room near the north wall and midway between the east and west walls. Just east of the foot of the bed was the door through which Laster and Nell Golden would have passed in leaving the house. Laster was standing by the side of the bed talking to deceased, while Nell Golden was nearer the door. The bed was directly in front of a window in the south side of the room.

When the shot was fired the deceased and Laster both started toward the defendant. She walked behind the stove and toward the east side of the room. Nell Golden ran to her, reached her before either of the men, grabbed her hand and pointed the revolver upward. The two women struggled for a moment for the possession of the revolver when defendant released her grasp of the weapon and told Nell Golden to take it if she wanted it. In the meantime the two men walked out on the porch and the women followed them to the porch after Nell Golden took the revolver from the defendant. There was no evidence as to what was done with the revolver at that time.

When the women reached the porch the deceased said he was hurt and Laster and the two women assisted him in walking back into the house and to the bed. Nell Golden called a physician by telephone. The doctor arrived in a few minutes and shortly thereafter the sheriff came to the house accompanied by two men.

When the physician arrived he inquired how the deceased had been shot and the defendant said it was by accident. Thereupon the deceased said: "She knows better than that." To this statement the defendant made no reply. The deceased pointed to Laster and Nell Golden and said they had nothing to do with it.

When the sheriff arrived he also inquired as to how the deceased had been hurt and defendant again said it was by accident. She then told the officer to step into the kitchen and she would tell him all about it. The two went to the kitchen and the defendant began to relate to the officer the circumstances of the quarrel she had had with the deceased during the evening. By this time so many people were crowding into the house and into the kitchen that the defendant's statement was interrupted and she did not complete it

by any explanation of the events immediately connected with the shooting.

The sheriff searched the premises for the revolver but failed to find it. A hole having the appearance of having been made by a bullet of the same caliber as the revolver with which the deceased was shot was discovered in a pane of glass in the window south of the bed on which deceased was seated when the shot was fired. This hole was two or three feet higher than the deceased's head would have been while he was sitting on the bed. No other bullet marks were found in the room. Nell Golden testified that she thought two shots were fired, but would not say positively that there was more than one. Witnesses living in the neighborhood testified that they heard three shots.

The sheriff took the defendant to the county jail and during the night she was heard to say that she hoped she had killed the "s—— of a b———." That she hoped he would die before morning. The witnesses who heard these remarks said she did not mention the name of the deceased just at that time, but the evidence tended to show that she made the remarks concerning him.

On the following morning the deceased was taken to his father's home at Rich Hill. The physicians attending him found that the bullet had passed through the upper part of his bladder, and decided upon a surgical operation, which was performed in the afternoon. Just before the operation the deceased made a dying statement which was signed by him after it had been reduced to writing by an attorney. The statement was in words and figures as follows:

State of Missouri, County of Bates, ss.

Duke Benefield, being first duly sworn, upon his oath states: That on December 20, 1909, in the evening, he visited the dwelling place of the woman known as Estella Martin, such dwelling place being in the northeast part of the city of Butler, Bates county, Missouri. That while engaged in conversation with the said woman, and without any cause known to him, the said Estella Martin fired

three shots at him from a revolver, one of which shots took effect and penetrated the body of affiant.

That he, affiant, is advised by his physician that the wound caused by the said shot is of very serious and dangerous nature and may cause his death. That he makes this statement hereinbefore set out in anticipation of death and as his dying declaration,

                                            DUKE BENEFIELD.

Subscribed and sworn to before me this 21st day of December, 1909.

                                        GEORGE TEMPLETON,    ·
(Seal.)                                     Notary Public.
My commission expires on March 25th, 1913.
Witnesses to signature:    W. H. Allen, A. Benefield.

The young man died a few hours after the dying declaration was signed.

The defendant was a witness in her own behalf and testified that the shooting was accidental; that she had been drinking during the evening, but remembered clearly and distinctly all that happened up to the time of the shooting; that only one shot was fired; that she had been in the habit of sleeping with the revolver under her pillow; that when Laster and Nell Golden announced that they were going to leave she went to the dresser to get the revolver for the · purpose of placing it under her pillow, preparatory to retiring with deceased; that when she took the weapon from the drawer she turned toward the deceased, put one hand back of her to close the dresser  drawer, staggered back against the dresser and in some manner unknown to her the revolver was discharged.    She further testified that there was no ill-will between the deceased and her the evening he was shot; that their apparent quarreling was only in a joking way; that they were on the best of terms, were engaged to be married and had intended to be married as soon as her husband obtained a divorce.    She denied making a statement in the county jail concerning deceased to the effect that she hoped she had killed him or hoped he would die, her explanation of such statements being

that she was talking about the deputy sheriff, and that she was angry at the deputy by reason of his conduct at her home after the shooting.

A brother-in-law of the defendant, who owned the house in which she lived when deceased was shot, testified that the hole in the window above the bed had been there for seven years. He further testified that on the day following the shooting he found the revolver with which the shot was fired; that it was in the kitchen of the defendant's house, lying upon a chair and covered with a woman's wrap of some kind; that there was only one empty chamber in the revolver when he found it.

Several witnesses testified to the good reputation of the defendant as to her honesty and veracity. These witnesses, on cross-examination, testified that her reputation for chastity was bad.

It was shown by the State in rebuttal that a number of years before the shooting of deceased the defendant, in the circuit court of Bates county, entered a plea of guilty to the charge of running a bawdy house.

The court instructed the jury upon murder in the first degree, murder in the second degree and upon the theory advanced by the defendant that the shooting was accidental, and also gave such general instruction as was necessary for the information of the jury in deciding the issues thus presented.

I. Appellant first assigns as error the ruling of the court admitting in evidence the statement made by deceased shortly after the shooting and in the presence of the defendant.

It appears from the testimony that Dr. Chastain was one of the first to arrive at defendant's home after Duke Benefield was shot. He was a witness and testified that upon his arrival he inquired as to what

was the matter; that defendant answered she had shot Duke Benefield but that it was an accident; that when defendant said it was an accident Benefield answered, "She knows better than that," and that defendant made no reply.

It was shown that defendant was standing near enough to have heard what Benefield said, and as she was under no legal restraint at the time, the case falls within the rule that an admission of guilt may be implied from the silence of the accused when statements are made in her presence and hearing, implicating her in the crime. [Kelley's Crim. Law and Prac. sec. 288; 1 Ency. Evidence, 386; State v. Walker, 78 Mo. 380; State v. Swisher, 186 Mo. 1; State v. Vickers, 209 Mo. 12.]

Neither is there any merit in the complaint that the court erred in striking out a part of the testimony of the witness Bullock on cross-examination and in permitting him to answer that he never had heard of the bullet hole in the window before. The record does not bear out the statements in appellant's brief upon this point. It shows that on the cross-examination of the witness Bullock the following occurred:

"Q. And you never did find any other shot except that one up in the window that was there when Jim Thomas bought the house?

"Object to that.

"Q. Well, one that was said to be there?

"By Mr. Dawson: Object to that and ask that it be stricken out.

"By the Court: So ordered.

"To which ruling of the court the defendant then and there excepted and still excepts.

"A. Never heard tell of that before."

No offer of proof was made when the objections to the foregoing questions were sustained, nor did the defendant move to strike out the answer of the witness.

If an objection to a question be sustained there should be an offer of proof by the party against whom the ruling is made in order that prejudicial error shall appear. [State v. Arnold, 206 Mo. 589; State v. Hodges, 144 Mo. 50; State v. Martin, 124 Mo. 514.]

And an improper answer by the witness should be followed by a motion to strike out, to be available for review on appeal. [State v. Bateman, 198 Mo. 212; State v. Sykes, 191 Mo. 62; State v. Foley, 144 Mo. 600.]

Witnesses McManus and McGinnis were permitted to testify, over defendant's objections, to a quarrel between the defendant and the deceased shortly before the homicide, in which the defendant was angry and used vile and profane language and threatened to tear down deceased's place of business if he did not comply with her demands. This testimony was competent as tending to show that the fatal shot was fired with felonious intent, and not by accident, as contended by the defendant. [State v. McNamara, 212 Mo. 150; State v. Cummings, 189 Mo. 626; State v. Callaway, 154 Mo. 91.]

II. Appellant complains that the court permitted the State to prove that a man named Klepper, who was in charge of defendant's house after her arrest, was seen near her house with a pistol on the morning after the homicide. This testimony in no manner connected the defendant with Klepper's possession of the weapon, and while it is not apparent upon what principle of law this testimony was admitted, yet in view of the conceded facts that the defendant did have a pistol at the time of the homicide and did fire the fatal shot, we cannot understand how such testimony could possibly have prejudiced the defendant upon the issues tendered.

III. Witnesses for the State testified to statements made by the defendant in the county jail on the

night of the homicide to the effect that she hoped she had killed him and that she shot to kill him. The defendant testified in her own behalf, and when first upon the witness stand did not deny making said statements. She was afterward recalled and asked as to whom she referred in the conversation at the jail as testified to by the witnesses for the State. She answered that she was talking about Bud Chambers, the deputy sheriff, and about his conduct at her home soon after the shooting. She then proceeded to narrate other portions of the conversation at the jail, and the court sustained an objection interposed by the prosecuting attorney. Appellant contends that this ruling of the court was prejudicial error.

Neither the prosecuting attorney or the court gave any reason for excluding this conversation, a part of which had been given in evidence by the State. The general rule is well settled that when one party introduces in evidence statements made out of court in a conversation by the adverse party the entire utterance thereby becomes admissible. The defendant, in testifying to what was said in the conversation at the jail, was clearly within this rule and was entitled to all that was said in relation to the person to whom she referred in the said conversation, and we think it was error to exclude it.

Was the ruling of the court prejudicial error? We are of the opinion that it was not and for the following reasons: It is evident that the statements made at the jail by the defendant, as testified to by the witnesses for the State, did not tend to prove the guilt of the defendant unless she referred to the deceased. The defendant was permitted to testify and did testify that she did not refer to the deceased but to Bud Chambers, the deputy sheriff, when she said she hoped he would die. She therefore flatly contradicted the witnesses for the State as to the statements made by her at the jail, so far as it was sought to draw any

inference of criminality therefrom. What more she could have added if allowed to proceed without objection, is not apparent. Indeed, if the defendant would put the court in the wrong as to this ruling she should have made an offer of proof so that the materiality of the testimony excluded would have appeared in the record. [State v. Arnold, 206 Mo. 589; State v. Hodges, 144 Mo. 50; State v. Martin, 124 Mo. 514.]

In addition to the foregoing it was in evidence that the defendant had stated at her home, before being taken to the jail, that she shot the "s—— of a b—— to kill him," and no attempt was made to deny that statement. For these reasons we are constrained to hold that there was not such error in the ruling of the court as tended "to the prejudice of the substantial rights of the defendant upon the merits." [Sec. 5115, R. S. 1909.]

. IV. It is assigned as error that the court admitted in evidence the alleged dying declaration of the deceased.

In order that a dying declaration may be competent as evidence it is essential to prove that the declarant made it under the belief that death was impending and that there was no hope of recovery. [State v. Kelleher, 201 Mo. 614; State v. Craig, 190 Mo. 332; State v. Nocton, 121 Mo. 537.]

It was shown in evidence that the deceased was fatally shot through the body and bladder. He suffered great pain and gradually grew worse until his death which was within forty-eight hours after the shooting. In the forenoon of the day he died and before he made the declaration, the physician attending him informed him that he could not recover. The deceased then told his father that he was going to die. He had also said to his father a few hours after the shooting that he was "all in and could not get well." He was suffering greatly from hemorrhage

and shock and had to be supported in bed when he signed the declaration. This testimony leaves no doubt in our minds as to the correctness of the action of the court in admitting the dying declaration in evidence. [State v. Kelleher, 201 Mo. 614; State v. Craig, 190 Mo. 332; State v. Nocton, 121 Mo. 537.]

V. There is no merit in the complaint that prejudicial error was committed because of the clause in the dying declaration that the firing of the shot was "without any cause." No objection was made to the declaration at the trial upon that ground, and moreover, as the defense relied upon was that the shooting was accidental, the clause objected to cannot be considered otherwise than as favorable to the defendant.

VI. On account of the earnestness with which counsel for defendant, in their brief and at the bar of this court, have combatted the theory of a felonious homicide and have urged the defense of an accidental shooting for their client, we have read and considered carefully the facts and circumstances in evidence bearing upon that phase of the case, and we are convinced that the jury was fully warranted in finding the defendant guilty of murder in the second degree.

Finding no prejudicial error in the record, the judgment is affirmed.

*Ferriss* and *Brown, JJ.,* concur