**STATE of Missouri, Respondent,**

v.

**Michael Lee QUINN, Appellant.**

No. 54478.

Supreme Court of Missouri,
Division No. 1.

Dec. 14, 1970.

Rehearing Denied Jan. 11, 1971.

John C. Danforth, Atty. Gen., John W. Cowden, Asst. Atty. Gen., Jefferson City, for respondent.

George L. Fitzsimmons, St. Louis, for appellant.

HIGGINS, Commissioner.

Michael Lee Quinn, indicted for murder, first degree, was convicted by a jury which assessed his punishment at life imprisonment. Sentence and judgment were rendered accordingly. §§ 559.010, 559.030, V. A.M.S.

Sam Travis was the owner of Travis Confectionary, 3100 Thomas, St. Louis, Missouri. At 8:30 p. m. "or shortly thereafter," Thursday, May 23, 1968, Mr. Travis, his wife Mae, and Olfred Oliver were present in the store when three men entered. Mrs. Travis was "bending down" on her knee filling a soda box. She stood up and told her husband to wait on the three men and "bent back and went on with" her work. Her husband was in the back room and went to the front of the store to wait on the men. She heard her husband ask the men what he could do and then heard four or five shots. She went to her husband, saw that he was dying, and called the police. Mrs. Travis saw only one man's face and was unable to identify any of the intruders in a lineup.

Olfred Oliver was playing checkers with Mr. Travis when the men entered the store, two with weapons. He saw one of them shoot Mr. Travis at the counter and heard seven shots altogether. He too, was unable to identify the intruders in a lineup. "Most likely when they came in the door and I—I backed up—most likely they had their backs to me."

Charles Bates, an employee of General Detective Agency, was off duty and in Neal's Lounge at Thomas and Easton on the date and at the time in question. Three men entered wearing green suits, white scarves, and yellow hats. They stayed about three minutes and then went toward the intersection of Thomas and Webster where Travis Confectionary was located. He heard "something sounded like firecrackers" and saw the three run from the store, one went down Webster, one went down Thomas, and the other went up Webster. When the police came he described the three men he had seen in the green suits. He identified defendant in a lineup the following morning and at trial as one of the three men he had seen in Neal's and running from the confectionary following the "firecracker" noises.

Willie Nettles had known defendant since the previous summer. At the time in question he saw defendant "down by" Travis Confectionary with Glenn Valentine and Robert Johnson, dressed in hats, coats, and trousers. Robert and defendant both had weapons of .38 or .32 caliber and defendant told him he was "going in to rob the man," and asked him to "go in with him." He saw them go in the direction of Travis Confectionary after "they had switched clothes." Mr. Nettles saw them enter the confectionary and from across the street "saw a man struggle and those two boys, Michael and Robert Johnson * * * and shots went up." He heard several shots fired by defendant and Robert after which he saw them run from the store. Defendant said he "shot him, like he was joking. * * * 'I burned the man up.'"

Defendant was arrested at 2300 Dayton at 11:45 p. m., May 23, 1968, as a result of broadcast descriptions, wearing yellow sport hat, green shirt, and matching green trousers. Post-mortem examination by Dr. Watson Kaminsky showed the cause of death of Mr. Travis to be five gunshot wounds and ballistic tests performed on pellets found in the body showed the pellets to have been fired by a .38 caliber weapon.

Sergeant Leroy Adkins of the St. Louis Police Department questioned defendant on May 24, 1968. He testified that defendant stated: " * * * that on the evening of the 23rd of May, Thursday evening, the exact time unknown, he was on the corner of Webster and Thomas talking to some girls, and also present were two fellows he knows as Robert Johnson and Glenn Valentine, and at this time Valentine— Johnson asked him to go into the confectionery, Travis Confectionery, and buy some candy or some soda or something, and he went inside and bought two candy bars, Snickers, and as he was standing at the counter, Robert Johnson walked in there with a nickel plated revolver in his hand, and he placed same alongside Mr. Travis' head, and at this time Travis grabbed the barrel of the gun, and they began struggling for possession of the gun, and he stated that he then reached into his —no, he stated that the gun went off, and he ran out of the store, and as he was going out Valentine was coming in.

"Q Thereafter did he make any additional statement to you at that time? A Yes, he did. He stated that wasn't the whole truth, that the true story was he was in the confectionery ordering the candy, and he observed Johnson and Travis struggling for possession of the gun that Johnson had. He then removed a pistol from his pocket and fired two shots into the meat counter. He did this to scare Travis in that struggling with Johnson for the gun. And he then heard the gun that Johnson had fire, and he ran out of the store. After this he said it was all a lie,

that he was merely joking with the police. * * * He said he ran out of the store, and sold the gun to a man unknown to him on the street, and he was paid twenty-five dollars.

"Q Did you ask him where was the twenty-five dollars? A I asked him for the twenty-five dollars and this is when he said he was joking."

Detective James King corroborated Sergeant Adkins with respect to admissions by defendant.

Defendant's case was his own testimony and that of his father and Joe Patterson, Jr., that the three of them were at 1308 Glasgow Avenue from 7:30 p. m. to 10:30 p. m., May 23, 1968, where The Original Gospel Four singing group was in rehearsal. Defendant also denied making the statement to Sergeant Adkins.

Appellant does not question the sufficiency of evidence and the foregoing statement demonstrates support for the jury's verdict.

■ Appellant's first allegation of error goes to the court's rulings sustaining challenges to veniremen on voir dire examination. The record shows that nineteen veniremen were excused by the court upon challenge for cause by the state following questions to the veniremen of which the following are representative:

"And, Mrs. Verdin, His Honor will instruct you that before the jury considers any punishment whatsoever in this case it will be their duty to determine the defendant's guilt or innocence. Murder in the first degree in Missouri is punishable by either life imprisonment or the death penalty. That having considered the evidence in the case you arrive as a member of this jury at a verdict of guilty of murder first degree, do you have any religious belief or moral scruples which would keep you from considering the death penalty? * * * Objection. * * * The Court: As I take it, Mr. McSweeney, you asked wheth-er or not she would consider the whole range of punishment. Mr. McSweeney: Yes, Your Honor. The Court: I will overrule the objection. * * * Mr. McSweeney: Let me ask it of you in this fashion. * * * If you arrived at a verdict of guilty and knowing what the alternative penalties are for this offense under Missouri law, do you have any moral or religious scruples or belief that would keep you from considering the entire range of punishment? Mrs. Verdin: No, I don't have that. * * *

"Mr. McSweeney: Mrs. Humphrey, if you are on this jury and arrive at a verdict of guilty of murder first degree, do you have any religious or moral belief or scruple that would keep you from considering the entire range of punishment? Mrs. Humphrey: Yes. * * * Mr. McSweeney: I will ask that Mrs. Humphrey be excused. The Court: All right. * *"

Appellant cites Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (and see also Duncan v. Louisiana, 391 U. S. 145, 194; Turner v. Louisiana, 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424; Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L. Ed.2d 751), that a death sentence could not be executed if handed down by a jury from which had been excluded for cause those who, without more, were opposed to capital punishment or had conscientious scruples against imposing the death penalty. From this he argues that it is constitutionally erroneous for the state to confer the power to determine guilt on a jury selected in the manner previously demonstrated because a jury so selected is unlike one chosen at random from a cross-section of the community and must necessarily be biased in favor of conviction, which is to say, a jury so qualified is a "hanging" jury.

Appellant acknowledges, as he must, "that Witherspoon v. State of Illinois is not really controlling here because the jury recommended life imprisonment and not the death penalty." See Bumper v. North

Carolina, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797; State v. Pollard, Mo., 447 S. W.2d 249, 251[2]. His "hanging jury" argument is also controlled by Witherspoon v. Illinois, because the court held that "In light of the presently available information," it was "not prepared to announce a per se constitutional rule requiring the reversal of every conviction returned by a jury selected as this one was," 391 U.S. 1. c. 516–518, 88 S.Ct. 1775, and, as in Bumper v. North Carolina, there was no evidence to support the claim that a jury so selected "is necessarily 'prosecution prone.' " 391 U.S. 1. c. 545, 88 S.Ct. 1788.

In this case only those veniremen who stated they had beliefs or scruples which prevented them from considering the full range of punishment were excluded upon challenge for that cause. Such exclusion is not prohibited by Witherspoon v. Illinois. State v. Pollard, Mo., supra, 447 S. W.2d 1. c. 251[3–5]; State v. Franklin, Mo., 459 S.W.2d 314.

■ Appellant's second allegation of error goes to the admission of his confession via the testimony of Sergeant Adkins. He concedes that "the Miranda warnings" were given him before he made the statement but contends the court erred in finding that the defendant knowingly and intelligently waived the rights which are his under those warnings. He asserts that the record does not show "a Miranda waiver" (Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L.Ed.2d 694; Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed. 2d 977) of the privilege against self-incrimination and the right to counsel; that the waiver was intelligently and understandingly made (Carnley v. Cochran, 369 U.S. 506, 82 S.Ct. 884, 8 L.Ed.2d 70); and that the court should have made a clear finding (Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908) that the statements and admissions were voluntarily made.

The record shows a hearing without the jury present at which evidence was adduced with respect to "Miranda warnings" to defendant and the voluntariness of the statements subsequently related in evidence by Sergeant Adkins. He testified that on May 24, 1968, he questioned Michael Quinn about the murder of Sam Travis. Prior to questioning, Sergeant Adkins advised defendant of his rights. "I told him that he had the right to remain silent, that he could have an attorney present under any questioning, and I informed him that anything that he said could and would be used against him in a court of law, and that if he couldn't afford an attorney, one would be appointed for him. Q Did you ask him whether or not he understood these things? * * * A He said he did. Q And then did he agree to answer your questions? A Yes."

The questioning took place about 11:00 a. m., and, although others may have spoken to defendant prior to that time, Sergeant Adkins had not, and defendant signed a written waiver of his rights. Defendant never asked for a lawyer, never indicated he did not want to talk further with Sergeant Adkins, and no other officer was present during this dialogue.

Defendant objected to the admission of his statements to Sergeant Adkins "on the basis that he wasn't given the proper Miranda warnings and * * * the statements * * * were given in a coercive atmosphere. * * * "

The objection was overruled with and by the court's finding "beyond a reasonable doubt that the police officer substantially advised the defendant that he had a right to remain silent, and that the officer then advised him of the fact that any statements he made would be used against him in court, and that he further advised him that he had a right to have the presence of an attorney, and the officer further advised the defendant that if he couldn't afford an attorney, one would be appointed for him for the questioning, and that the defendant even intelligently and affirmatively waived his rights and then did make a statement to the officer. * * * that also the defend-

ant further told the officer that he understood his rights."

The foregoing demonstrates not only that the "Miranda warnings" were given as conceded by appellant but also that there was no showing of coercive surroundings, and that the court's findings of intelligent waiver of rights are supported by the record. In its posture this case is similar to State v. Taggert, Mo., 443 S.W. 2d 168, where, in denial of the same contention, the court said: "There was here clear advice to appellants of this right to counsel. Secondly, the record is not silent as to what happened after the warnings were given. * * * appellant stated unequivocally that he understood his constitutional rights (under the Miranda decision). Knowing the right to have counsel present, * * * appellant made (no) request for same as would compel a halt in any interrogation by the police * * * under the Miranda decision. See and compare State v. Reynolds, Mo., 422 S.W.2d 278, 284[10], * * * that there was no infringement of Miranda rules where defendant was, before questioning, advised that he had a right to counsel, and defendant did not ask to see an attorney. This is sufficient evidence to show a knowing and intelligent waiver of that constitutional right." 443 S.W.2d l. c. 173.

■ With respect to the charge that the court's finding is inadequate on the issue of voluntariness, the record shows that in addition to the according and intelligent waiver of constitutional rights, there were no coercive circumstances to taint the questioning and statement. The admissibility of the statement was ruled following an evidentiary hearing out of the presence of the jury and upon objection seeking to prevent admission of the statement. Although the findings fail to employ the word "voluntarily," it is implicit in the findings and in the context in which they were made that the statement was also shown and found to have been voluntarily made. State v. Stidham, Mo., 449 S.W.2d 634, 643[10].

■ Finally, appellant charges error in refusing to admit a second statement which he made to Sergeant Adkins.

Upon cross-examination of Sergeant Adkins, the defense elicited that defendant made a second statement on May 26, 1968, which apparently contained self-serving statements made by defendant. The defense sought to have the statement in evidence, but, upon objection by the state, the court refused to admit it on the ground it was self-serving. The defense made an offer of proof which was also overruled. It is now contended that the court should have received the statement as part of a "single connected admission or statement of the defendant relating to the same subject matter," which is to argue that when an admission against interest is received in evidence, all that is said at the same time and place should be received. See, e. g., State v. Wright, 352 Mo. 66, 175 S.W.2d 866; State v. Carlisle, 57 Mo. 102; State v. Branstetter, 65 Mo. 149; State v. Knowles, 185 Mo. 141, 83 S.W. 1083; State v. Merkel, 189 Mo. 315, 87 S.W. 1186; State v. Lovell, 235 Mo. 343, 138 S.W. 523.

There is no question that where part of a confession or admission is introduced by the state, the defendant is entitled to introduce the remainder, even though self-serving, but the difficulty with appellant's position with respect to such right is that the statement which he sought to introduce was part of a dialogue between Sergeant Adkins and defendant on May 26, 1968, separate and apart from the statement of May 24, 1968, which had been admitted previously in its entirety. It is equally well-settled that "a self-serving statement by accused is not admissible to rebut an incriminating statement proved against him where the two statements were not part of the same conversation." 22A C.J.S. Criminal Law § 737, p. 1090.

Apart from the merits of the latter rule, its application in this case was not harmful to defendant. Even though the whole statement which he sought to use, contain-

ing both incriminating and favorable statements, was excluded, he nevertheless was permitted to elicit that a second conversation did take place May 26, 1968, between him and Sergeant Adkins, and that he did then make "different" statements, and denied the previous statement of May 24, 1968.

Judgment affirmed.

HOUSER and WELBORN, CC., concur.

PER CURIAM.

The foregoing opinion by HIGGINS, C., is adopted as the opinion of the court.

All of the Judges concur.