THE STATE v. ERNEST MCMURPHY and HENRY MCMURPHY, Appellants.—25 S. W. (2d) 79.

Division Two, February 19, 1930.

*Wm. E. Suddath, Leslie & Moritz* and *M. D. Aber* for appellants.

*Stratton Shartel,* Attorney-General, for respondent; *G. C. Weatherby* of counsel.

HENWOOD, C.—An information was filed in the Circuit Court of Johnson County by which the defendants were jointly charged with stealing six cows, the property of J. E. and J. R. Eberts, of the value of $573.70. They were tried together, found guilty, sentenced to imprisonment in the penitentiary for two years, and, in due course, have perfected an appeal to this court.

At the time in question, J. E. Eberts owned a farm of 1010 acres five miles south of Warrensburg, in Johnson County. He and his son, J. R. Eberts, were jointly interested in farming and in raising cattle. Immediately across the public road on the west side of the Eberts farm was the home farm of Levi McMurphy, deceased, father of the defendants, consisting of 485 acres. The defendant Henry McMurphy lived on this farm, which he and his brother, Levi, Jr., owned, subject to their mother's life estate, and operated for their mother, as directed by their father's will. They also raised cattle on this farm. The defendant Ernest McMurphy owned a farm of 200 acres, situated a quarter of a mile south of the Eberts' farm, where he lived and was engaged in raising hogs and calves. The Eberts and McMurphy families had been friendly neighbors for many years, and, so far as the record shows, the prosecuting witnesses and the defendants in this case were regarded as good citizens by the people residing in that vicinity.

In substance, the evidence adduced by the State is as follows: The Eberts had forty-two cows. Their cows frequently strayed out of their pasture and into the McMurphy pasture and on and along the public road between the two pastures. On Saturday, September 1, 1928, six of their cows, five white-faced and one red, were missing. These six cows were never found, but twelve of their cows were found in the McMurphy pasture on the following Monday. A few days later, J. R. Eberts learned from one Brockman, a truckman at Warrensburg, that, on August 29, 1928, one of Brockman's trucks hauled six cows for the defendants from the loading chute on Ernest McMurphy's farm to the Kansas City stockyards. These cows were loaded and taken to Kansas City for the early morning market at the usual time and in the usual way. Brockman had handled previous shipments of cattle for the defendants in the same way. J. R. Eberts went to the Kansas City stockyards, where he learned that Henry B. Forsett, owner of the M. K. & T. Commission Company, had received six cows from the defendants which he sold to Charlie Lewis, a speculator connected with Fry & Pringle, brokers; that Charlie Lewis sold six cows to Frank Bowersock, a salesman for the Less-White Commission Company, and that Frank Bowersock sold the last-mentioned six cows to Charles V. Cresap, a buyer for Armour & Company, all on August 29, 1928. Upon further inquiry, he learned that the last-mentioned six cows were among the 1000 cattle, or more, slaughtered by Armour & Company on August 30, 1928. At the packing house of Armour & Company, he examined twenty-five or thirty hides out of an assortment of 130 to 150 hides of these cattle. Among the twenty-five or thirty hides, he found one which he said he "recognized," by its color and the "s" brand on the left hip, as the hide of the missing red cow. He arranged for this

hide and six or seven others to be laid aside, and went home and inspected the brands of the cows on the farm. When he returned to the packing house and made a further examination of these hides. he picked out two hides, of white-faced cows, with open "A" brands, and one hide, of a white-faced cow, with a "U" brand, which brands he said were "similar" to the open "A" brand and the "U" brand on some of the cows on the farm. J. E. Eberts also went to the packing house and examined the seven or eight hides which had been laid aside. He said he was able to "identify" one of these hides, by its color and the "s" brand on the left hip, as the hide of the missing red cow; and that the open "A" brand on two of these hides, of white-faced cows, and the "U" brand on one of these hides, of a white-faced cow, "corresponded" to the open "A" brand and the "U" brand on some of the cows on the farm, but he said he was not "sure" of the similarity of these brands until after he had gone home and inspected the brands of the cows on the farm. Other witnesses for the State said that the open "A" and "U" brands on these three hides were similar to the open "A" and "U" brands on some of the Eberts cows.

Henry B. Dorsett, owner of the M. K. & T. Commission Company. testified: He received five white-faced cows and one red cow from the defendants on August 29, 1928. He observed that four of the white-faced cows were branded on the left side, about a foot back of the shoulder, but could not say what the brands were. He saw only the right side of the other white-faced cow and the red cow, and observed no brand on either of them. These six cows weighed 6370 pounds. He sold them to Charlie Lewis on the same day for $538.39, net, and accounted therefor to the defendants. On cross-examination, he said that there are thousands of cattle branded with open "A's" and "S's." He admitted that, on November 10, 1928, he signed a written statement concerning the six cows received from the defendants on August 29, 1928, which contained the following: "I am unable to identify the hides as being off those cattle and would not undertake, under oath or otherwise, to make a positive identification of them."

Frank Bowersock, salesman for Less-White Commission Company, testified: He bought six cows from Charlie Lewis on August 29, 1928, and sold them to Vernon Cresap, buyer for Armour & Company, on the same day. He could not describe these cows. According to his record, they weighed 6360 pounds. On cross-examination, he said that Charlie Lewis was a speculator who "trades" through Fry & Pringle, brokers; that Lewis handled "somewhere around twenty-five head" of cattle on the morning of August 29, 1928, "before" he bought the six cows from him; and that he did not know where

Lewis got the six cows he bought from Lewis, nor whether they were white-faced cattle or not.

Charles V. Cresap, buyer for Armour & Company, testified: According to the company's record, he bought six cows from Frank Bowersock for the company on August 29, 1928. He bought these cows "for killing purposes," and they were sent to the packing house. On cross-examination, he said he could not "identify" these cows, nor say whether they were branded or not.

J. R. Eberts testified that, on the day the defendants were arrested, "they" talked to him in the hall of the courthouse at Warrensburg, and said to him: "You can get us out of this if you will. We will pay you for your cattle and you go in and tell Judge Bradley (prosecuting attorney) to let us go and pay for them and that we had been good friends all our lives;" that, later on the same day, Judge Bradley asked the defendants "if they had any branded cattle and they said no;" and that the defendant Ernest McMurphy said to Judge Bradley: "Can't we square with you, Judge, and pay for the cattle and pay you well for your time and trouble?"

Judge Bradley and Mason Lane (sheriff) testified to the same effect as to the conversation between Judge Bradley and the defendants.

Both of the defendants took the stand and testified at length. They were examined in detail as to their connection with the business of raising and marketing cattle, and especially as to the shipment of August 29, 1928. Among other things, they said: This shipment consisted of five white-faced cows and one red cow. These cows were loaded at the chute on Ernest's farm into one of Brockman's trucks and taken to Kansas City for the early morning market. They were shipped in the name of "McMurphy Bros.," as owners, to the M. K. & T. Commission Company. Henry went to Kansas City and attended to the sale of these cows. The red cow and one of the white-faced cows belonged to Ernest and the other four white-faced cows belonged to "mother and the boys." The money received for the six cows was divided accordingly. Ernest got the red cow from his father and raised her and used her for a milk cow. He milked her until about a month before she was sold. She was six years old at the time she was sold. "There were no brands or marks on her." The five white-faced cows were kept on the home farm. They did not know whether these cows were branded or not. At the time these cows were shipped, there were about 175 cattle on the home farm. Henry admitted that, on the day he and Ernest were arrested, he told Judge Bradley he did not think there were any branded cattle on the home farm, and said that, after going home and investigating the matter, he found that some of the cattle were branded. He further said that the branded cattle on the home farm were

among seventy-five head of cattle which his brother, William Mc-Murphy, bought at the Kansas City stockyards and sold to his father "three or four years ago;" and that these seventy-five cattle were not brought to the home farm until the fall of 1927. The defendants further testified that the sheriff came to their homes and told them to come to his office to discuss "cattle stealing" in the neighborhood, but that they were not arrested, nor advised that they were charged with stealing the cows in question, until after they went to the sheriff's office, as requested, and were taken by him to Judge Bradley's office. Both denied having any conversation with J. R. Eberts in the hall of the courthouse on that day. They admitted that they talked to him and the sheriff and Judge Bradley in Judge Bradley's office, on that day, concerning their shipment of six cows on August 29, 1928. Henry testified that, in the course of that conversation, his brother Ernest said to J. R. Eberts: "Roggey, if you have got the guts to think we took the cattle, we would rather pay for them." He further testified that, with the exception of this remark, neither he nor his brother said anything about paying for the six missing cows, and that neither of them said anything about paying Judge Bradley any fees or expenses. As to that conversation, Ernest testified: "I said—I made a remark if he thought we took the cattle, I would pay him. That was just all that was said. Roggey said that was all he wanted." It further appears from the testimony of the defendants that, when J. R. Eberts was looking for the six missing cows, they told him they had not seen them; that Henry told him about the other Eberts cows which strayed into the Mc-Murphy pasture and were found there after the six cows in question were missed; and that, when J. R. Eberts asked Henry if he had seen any trucks in the neighborhood, Henry said: "No trucks was out there except the one I had."

They were corroborated by their brother, William McMurphy, as to the branded cattle on the home farm. This witness said that, "three or four years ago," he bought several cars of cattle at the Kansas City stockyards, some of which were branded; that he sold seventy-five of these cattle to his father "about a couple of years ago;" and that "twenty or twenty-five" of those sold to his father were branded, but he did not know anything about the brands on them.

Kyle Howard, a neighbor of the defendant Ernest McMurphy, testified that he traded cows with Ernest, a red cow for a red cow, "a couple of years ago;" and, at that time, Ernest had another red cow which he "wouldn't trade off."

Nathan J. Bush, a resident of Warrensburg, testified that Roggey (J. R.) Eberts asked him if he would see the defendants about a settlement of this case, and he told Roggey he would talk to the de-

fendants, if he met them on the street, but would not go to their homes to talk about a settlement; and that Roggey said: "All that he cared for was to get the money for the cattle; that he didn't want to see the boys punished; that he would like to have his money for the cattle and for me to go and get it."

I. Counsel for the defendants contend with much earnestness that the evidence is not sufficient to sustain the verdict and judgment of conviction in this case. The Attorney-General, with commendable frankness, expresses the same view. And a careful consideration of the evidence satisfies us that this view is well taken.

For the sake of the argument, it may be conceded that the identification of the hide found at the packing house as the hide of the missing red cow is sufficient to establish the *corpus delicti;* that is, sufficient to justify the inference that the missing red cow had been stolen. Indeed, for the sake of the argument, it may also be conceded that this is sufficient to justify the inference that the five missing white-faced cows had been stolen. Yet, the evidence falls far short of showing that the six missing cows, or any of them, were stolen by the defendants. Both J. R. and J. E. Eberts said that they identified the hide found at the packing house as the hide of the missing red cow by its color and by the "s" brand on the left hip part of the hide. But, neither Dorsett nor any other witness said that the red cow which the defendants shipped to Dorsett, and which Dorsett sold to Lewis, had any brand on her, to say nothing of the defendants' testimony that "there were no brands or marks on her." It will also be noted that Lewis did not testify; that neither Bowersock nor Cresap could describe the six cows which Bowersock bought from Lewis and sold to Cresap; and that Lewis handled "somewhere around twenty-five head" of cattle on the morning of August 29, 1928, "before" Bowersock bought the six cows from Lewis which Bowersock sold to Cresap and which were sent to the packing house. So, in order to convict the defendants of stealing the six missing cows, or the missing red cow, it was necessary for the jury to first infer, from the identification of the hide found at the packing house as the hide of the missing red cow, that the six missing cows, or the missing red cow, had been stolen; and then infer that the hide so identified was the hide of a red cow bought by Cresap from Bowersock, and by Bowersock from Lewis; and then infer that said red cow was the same red cow that Lewis bought from Dorsett, notwithstanding the inability of either Bowersock or Cresap to describe the six cows which Bowersock bought from Lewis and sold to Cresap, the failure of Lewis to testify, and the failure of the State to show that the red cow received by Dorsett from the defendants and sold

by Dorsett to Lewis had an "s" brand on her left hip. As we have already said, it may be conceded, for the sake of the argument, that the jury had a right to infer, from the identification of the hide found at the packing house as the hide of the missing red cow, that the missing red cow, or the six missing cows, had been stolen. But, having found this fact by inference, the jury was not authorized to build inference upon inference, as above indicated, and thereby conclude that the six missing cows, nor that the missing red cow, had been stolen by the defendants.

Where, as in this instance, the State relies wholly upon circumstantial evidence, "the circumstances, to warrant a conviction, must be consistent with each other, must tend to prove guilt, and not only must be consistent with the hypothesis of defendant's guilt, but must be inconsistent with every other reasonable hypothesis, including the hypothesis of his innocence, and if the facts are consistent with his innocence defendant should be acquitted." [16 C. J. 1011.] In discussing this rule, Judge BURGESS said: "Where a chain of circumstances leads up to and establishes a state of facts inconsistent with any theory other than the guilt of the accused, such evidence is entitled to as much weight as any other kind of evidence, *but the chain, as it were, must be unbroken, and the facts and circumstances disclosed and relied upon must be irreconcilable with the innocence of the accused in order to justify his conviction.*" [State v. Morney, 196 Mo. l. c. 50, 93 S. W. l. c. 1119.] If we apply this rule, it is manifest that this conviction cannot be permitted to stand. In other words, all of the facts and circumstances shown by the evidence in this case can be taken as true and the defendants nevertheless be innocent of the crime charged. The failure of the State to show, by any substantial evidence, that the red cow shipped by the defendants to Dorsett and sold by Dorsett to Lewis was the red cow alleged to have been stolen is the missing link in the chain of evidence. The absence of such evidence leaves the verdict of the jury resting merely upon a suspicion or probability of the defendants' guilt, and suspicion or probability of guilt is not enough to justify the State in depriving citizens of their liberty. [State v. Perkins (Mo. Sup.), 18 S. W. (2d) l. c. 8.]

The statements said to have been made by the defendants to J. R. Eberts and Judge Bradley cannot be interpreted as admissions that they stole the cows in question. True, their offer to pay for the missing cows raises a suspicion of their guilt, but proof of such an offer does not supply the missing link in the State's case. In this connection, see our ruling in State v. Matticker, 22 S. W. (2d) 647, not officially reported.

It follows that the trial court should have sustained the demurrer offered at the close of all of the evidence. In addition to the cases

cited above, see State v. Archer (Mo. Sup.), 6 S. W. (2d) 912; State v. Zeikle (Mo. Sup.), 296 S. W. 117; State v. Tracy, 284 Mo. 619, 225 S. W. 1009; State v. Ruckman, 253 Mo. 487, 161 S. W. 705; State v. Counts, 234 Mo. 580, 137 S. W. 871; State v. Scott, 177 Mo. 665, 76 S. W. 950; State v. Ballard, 104 Mo. 634, 16 S. W. 525.

II. The only other complaint made here by the defendants is that—"The State's principal instruction, D, was erroneous in that it authorized the jury to return a verdict of guilty without taking into consideration the defense offered."

There is no merit in this complaint. The State's Instruction D predicated a conviction upon a finding that the defendants stole the cows in question, and also predicated an acquittal upon a finding that they did not steal said cows. It is apparent, therefore, that this instruction did not ignore the defense offered in this case, namely, that the defendants did not steal, nor, at any time, have in their possession, the cows alleged to have been stolen.

Unless the State is able, upon another trial, to produce the proof necessary to sustain a conviction of the defendants, or either of them, this prosecution must fail for the want of such proof. On the record before us, the proof is insufficient. For that reason, the judgments entered against the defendants are reversed and the cause remanded. *Davis* and *Cooley, CC.,* concur.

PER CURIAM:—The foregoing opinion by HENWOOD, C., is adopted as the opinion of the court. All of the judges concur, except *Walker, J.,* absent.