THE STATE v. ROBERT PRITCHETT, Appellant.—39 S. W. (2d) 794.

Division Two, June 5, 1931.

*W. L. Cole* and *T. P. Hukriede* for appellant.

*Stratton Shartel,* Attorney-General, and *Carl J. Otto,* Assistant Attorney-General, for respondent.

HENWOOD, J.—By an information filed in the Circuit Court of Franklin County, the defendant was charged with murder in the first degree. The jury found him guilty "as charged," and assessed his punishment at imprisonment in the penitentiary for life. He was sentenced in accordance with the verdict, and, in due course, appealed.

The following statement of the evidence adduced by the State (allowing for some alterations) is taken from the Attorney-General's brief:

"Eugene Frossard, the victim of the alleged murder, was seventy-one years of age, and lived alone on a farm, near the town of St. Clair, in Franklin County. His house was one quarter of a mile northwest of the home of Dan Arnold, and about a mile and a half from the home of Dighton Lewis. The land between Frossard's and Lewis's was mostly open fields. Frossard's house stood on a hill, and faced the south. Two doors opened into the front of the house, one into each of two front rooms. On the morning of June 27, 1930, Frossard was found dead by Dan Arnold. The door of the east front room was standing open when Arnold arrived, and Frossard's body was on the floor, about one foot from the door. The top of his head had been shot off. His hat was on the floor nearby. The shot had entered the back of his head, and ranged upward. On the ceiling of the room shot marks were scattered over a surface of eight or nine feet, beginning about a foot inside of the door. The room had a height of eight feet. Frossard was an erect man, five feet and ten inches tall. No gun was found in the room. The defendant, who was sixty-eight or seventy years of age, lived alone in the neighborhood, first at one place and then at another. He and Frossard had been seen together occasionally, and seemed to be good friends. It was generally known that Frossard carried money on his person, in a pocketbook, pinned to his hip pocket with a safety pin. When his body was found his hip pocket was turned wrong side out, and a safety pin was lying on the floor, about three feet from his body.

"About the first of June, 1930, while Alfred Bailey was watering his horses at a trough in St. Clair, the defendant approached him, and asked him what he was doing. Bailey said he wasn't doing anything. The defendant said, 'How would you like to have about $850 or $900?' Bailey said, 'If I could find it, it would be all right.' He thought the defendant was 'kidding.' The defendant said, 'If you go with me, it could be easy got.' Bailey said, 'What is it, a holdup?' The defendant said, 'Well, you might call it that.' Bailey said, 'No.' He thought yet the defendant was 'kidding.' The defendant then said, 'If you don't want to go, don't say anything about it.'

"About two weeks before Frossard was killed, the defendant stayed over night at Dan Arnold's home, and the defendant asked Arnold if Frossard had very much money. Arnold told him he thought not. The defendant asked Arnold if Frossard had as much as three or four hundred dollars. Arnold told him he thought not. The defendant then said, 'He is going to get robbed, and whoever robs him had better kill him before he starts in, for that old devil ain't afraid of anything.'

"On the morning of June 26th, the defendant went to the home of Dighton Lewis, who is related to defendant by marriage. Three

boys, Burley Lewis, nephew of Dighton, Vivian Lewis, son of Dighton, and Gilbert King, were in a room upstairs. The defendant went upstairs, and talked to Vivian and King. Burley was on the bed, reading. The defendant, Vivian and King then went downstairs, for a drink. The defendant asked them whether or not Frossard still lived over on the old Perry Lewis place, and the boys said he did. The defendant then went upstairs again, where Burley was still reading, and said, 'How does your gun shoot?' Burley said, 'Pretty good.' The defendant said, 'Have you got any shells?' Burley said, 'No.' The defendant then said he guessed he would have to go to the store and get some shells and go hunting. The gun lay on the 'two by fours,' above the bed, in view of the defendant. It was a twelve gauge, single barrel, hammer shotgun. About noon, Mrs. Lewis came home while the defendant was talking to the boys. The defendant stayed at the Lewis home for dinner, and, after dinner, said he was going to Steve Taylor's, about a quarter of a mile away, and would return in a few minutes. He returned at about 3:30, went upstairs, and came down with Burley's gun in his hand, and departed. On that afternoon, defendant went to the home of Steve Taylor, near Mt. Hope, about two o'clock. He said he was going squirrel hunting, and asked Taylor's nine-year-old son, Junior, to go to the store to buy fifteen cents worth of shotgun shells for him. Steve said fifteen cents worth of shells couldn't get many squirrels, and the defendant replied that that would be plenty. The defendant told Mrs. Taylor to instruct the boy as to the size of the shells, and she wrote a note to the storekeeper and gave it to Junior. The defendant then gave Junior a quarter, and told him to buy fifteen cents worth of shotgun shells, and to keep the change. Junior went to W. H. Pierce's store at Mt. Hope, and handed Mrs. Pierce the note, in which the quarter was wrapped. She gave him four twelve gauge shotgun shells, containing smokeless powder and No. 4 shot, for the fifteen cents, and a package of tobacco and some candy, for the dime. Junior returned from the store, and delivered the four shells to the defendant. About four o'clock that afternoon, Frossard, on his way home from the Lonedell store, passed Arnold's place. About thirty minutes later, Arnold and John Dickinson, while putting up hay at Arnold's place, heard the report of a gun, which came from the direction of Frossard's house, a quarter of a mile away. The report sounded like that of a shotgun rather than of a rifle.

"About 5:15 or 5:30 that afternoon, the defendant passed George Jobe, who was in his pasture about three-quarters of a mile southwest of Frossard's house. The defendant was coming from the direction of Frossard's house, and going west. He was in an open field when Jobe first saw him, and, when about forty feet away,

Jobe said, 'Hello, Bob.' The defendant didn't stop or speak. Jobe then asked if he had been squirrel hunting, and the defendant did not reply. Jobe next asked if he had killed any, and the defendant replied that he had not; that he hadn't found any. A little after six o'clock, the defendant returned to Dighton Lewis's home with the shotgun, and took it upstairs, to the place from which he had taken it. He then asked Mrs. Lewis for a little lunch. Upon being asked to stay for supper, he said he wanted to get on to St. Clair; that he had a way to go to St. Louis; that, if he went that evening, he could get there without having to pay; and that, if he waited until the next morning, he would have to take the train or bus. Mrs. Lewis asked him if he saw anything to shoot at. He said he saw nothing to shoot at. He ate a lunch, and left. About eight or 8:30 that night, the defendant was seen, about a mile from St. Clair, walking west, towards St. Clair. About 7:15 or 7:20 the next morning, deputy sheriff Reed saw the defendant standing on the platform of the railroad station in St. Clair.

"Mrs. Lewis examined the gun the day after the defendant had it. It had not been shot for six weeks before the defendant had it. The inside of the barrel was dirty and black from powder smoke, and, by pressing her finger in the muzzle, her finger was made black. Burley Lewis also examined the gun. He looked through the barrel, and, from the smell of fresh powder and the powder marks, it appeared to have been shot.

"A day or two later, the prosecuting attorney, with the sheriff and deputies Reed and Rucker, made an examination of Frossard's house, and found No. 4 shot in the door casing and ceiling. They extracted some of the shot, and the same were introduced in evidence. The inside of the room, in which Frossard's body was found, was painted with blue paint. A sliver of wood taken from the wall of that room by Reed, and introduced in evidence, was coated with blue paint. When the officers examined Burley Lewis's gun the day after Frossard was killed, there was a little spot of paint on the barrel, of the same color as the paint on the sliver of wood taken from the wall of the room in which Frossard's body was found. On June 28th, the prosecuting attorney, Reed and Rucker went to St. Louis, to arrest the defendant. The defendant's son took them and a St. Louis detective to the defendant's rooming house, where the defendant's son knocked on the door, and said, 'It is me dad, open the door.' The defendant opened the door, and the detective pushed him aside, lifted the pillows of the bed, and found an automatic pistol. There was an open knife, with a three and one-half-inch blade, on the dresser; also some food, whiskey bottles and four weather gambling tickets. The defendant was taken to police headquarters in St. Louis and searched, and $12.23 was found on his

person. He stated that the money had been paid to him as wages, and that he had paid five dollars to his landlady for his room. When asked if he killed Frossard, he said, 'I don't know anything about it.' He admitted sending the boy to buy shells. He said he did not shoot any of the shells, but threw all four of them away. When asked if he thought he could find the shells, he said he did not think he could; that he had thrown them away between the Possum Hollow Schoolhouse and the Bruns Bridge over the Meramec River, about three miles from Frossard's place. When asked if he would go with Reed and Rucker on the next morning to look for them, he said that it was of no use; that he couldn't find them, because he threw them out in the weeds, away from the path. When asked why he threw the shells away, he said, 'I didn't have no more use for them.' To the question, 'Why didn't you leave them with the man you borrowed the gun from?,' he answered, 'I don't know whether he would need them or not.' The defendant was employed by William Witte, a farmer in Franklin County, from March 12th to June 12th, 1930. He got his board and washing and $15 per month for his work. Witte paid him $5 on June 12th; and $10 during the previous week.''

The defendant stood on his demurrer to the evidence, and now contends that the evidence is insufficient to support the verdict. This is the sole question raised by the defendant on this appeal.

When, as in this case, the State relies entirely on circumstantial evidence, ''the circumstances, to warrant a conviction, must be consistent with each other, must tend to prove guilt, and not only must be consistent with the hypothesis of the defendant's guilt, but must be inconsistent with every other reasonable hypothesis, including the hypothesis of his innocence.'' [16 C. J. 1011.] ''Where a chain of circumstances leads up to and establishes a state of facts inconsistent with any theory other than the guilt of the accused, such evidence is entitled to as much weight as any other kind of evidence, *but the chain, as it were, must be unbroken, and the facts and circumstances disclosed and relied upon must be irreconcilable with the innocence of the accused in order to justify his conviction.''* [State v. Morney, 196 Mo. l. c. 50, 93 S. W. l. c. 1119.] (Italics ours.) Measured by this yardstick, the evidence in this case falls short.

The evidence shows that, about three or four weeks before Frossard was killed, the defendant asked Alfred Bailey to ''go with'' him on ''a holdup,'' or something of that sort; that, about two weeks before Frossard was killed, the defendant asked Dan Arnold if Frossard had ''very much money,'' and said to Arnold, ''He (Frossard) is going to get robbed and whoever robs him had better kill him before he starts in;'' that Frossard carried money in a

pocketbook, pinned to his hip pocket with a safety pin; that, about four o'clock in the afternoon of June 26, 1930, Frossard passed Arnold's home on his way to his own home, about a quarter of a mile from Arnold's home; that, about 4:30 o'clock that afternoon, Arnold and John Dickinson, then at Arnold's home, heard the "report" of a shotgun in the direction of Frossard's home; that, at that time, the defendant was somewhere in that vicinity with a shotgun and some shotgun shells loaded with No. 4 shot; that, about 5:15 or 5:30 o'clock that afternoon, the defendant was seen, carrying a shotgun, about three-quarters of a mile from Frossard's home, and coming from the direction of Frossard's home; that, the next morning, June 27th, Arnold found Frossard's dead body in one of the front rooms of Frossard's house; that the top of Frossard's head had been shot off with a shotgun shell loaded with No. 4 shot; that the shot had entered the back part of his head and ranged upward; that his hip pocket was turned wrong side out, and a safety pin was lying on the floor nearby; that, in the afternoon of June 27th, Burley Lewis and his stepmother examined the shotgun carried by the defendant in the afternoon of June 26th, and it appeared to have been fired while in his possession; and that, later, in the night of June 27th, when the officers examined it, there was a spot of paint on the barrel, of the same color as the paint on the sliver of wood taken from the wall of the room in which Frossard's body was found. However, the evidence fails to show whether or not this spot of paint was on the barrel of the shotgun when the defendant borrowed it, about 3:30 o'clock in the afternoon of June 26th, or when he returned it, about six o'clock in the afternoon of that day; and the evidence also fails to show that the defendant was any nearer to Frossard's house than three-quarters of a mile in the afternoon of that day, or that the shot heard by Arnold and Dickinson about 4:30 o'clock in the afternoon of that day was the shot that killed Frossard; and, while the evidence shows that Frossard passed Arnold's home, about four o'clock that afternoon, going in the direction of his own home, and that his dead body was found in his house sometime in the morning of the next day, June 27th, it fails to show that he was killed in the afternoon of June 26th, while the defendant had Burley Lewis's shotgun, or at what time he was killed.

Thus we see that the facts and circumstances shown by the evidence are not inconsistent with the innocence of the defendant. It matters not that there is no evidence tending to show that some person other than the defendant killed Frossard. That there was opportunity for some other person to do so cannot be gainsaid. True, the evidence raises a strong suspicion of the defendant's guilt. But, mere suspicion, however strong, cannot take the place of evidence, and a verdict based upon mere suspicion will not be permitted to

stand. [State v. Nagle (Mo. Sup.), 32 S. W. (2d) 596; State v. McMurphy, 324 Mo. 854, 25 S. W. (2d) 79; State v. Matticker (Mo. Sup.), 22 S. W. (2d) 647; State v. Buckley, 309 Mo. 38, 274 S. W. 74; State v. Morney, *supra*.]

The State may be able, at another trial, to produce additional proof of the defendant's guilt; if not, this prosecution must fail for the want of proof.

The judgment is reversed and the cause remanded. All concur.