THE STATE v. VIRGIL DAVIS, Appellant.—84 S. W. (2d) 633.

Division Two, July 11, 1935.

*Lz Banta* for appellant.

*Roy McKittrick,* Attorney General, and *William W. Barnes,* Assistant Attorney General, for respondent.

COOLEY, C.—Under an information filed in the Circuit Court of Douglas County charging robbery in the first degree defendant was tried and convicted and his punishment was assessed at five years' imprisonment in the penitentiary. From sentence and judgment on the verdict he appeals. The sole question presented on the appeal is whether or not there is sufficient evidence to sustain the conviction. The State's evidence tends to prove the following:

The victim of the robbery was William Bray, a man sixty-six years of age, who lived alone in the country. He testified that the robbery occurred at night, between twelve and one o'clock, "around the 20th" of May, 1933. He could not fix the day of the month. Other evidence tended to show that it might have been later in the month. Bray testified that he had been asleep and was awakened by a man holding his wrist; that when he awoke this man said to him, "We hear you have got money in the house and we have come to get it;" that he at first denied having money, except some change in a drawer; that the men,—there were three in the house—searched the house ten or fifteen minutes and finally one of them called for the coal oil can, whereupon he "weakened" and told the men where the money was and they took it; that there was close to ninety dollars, "one twenty and four tens and possibly a little silver;" that the men then

tied his hands and feet and left the house, leaving him thus tied; that as soon as they had gone he extricated himself from his bonds and "made for the law." He said it was dark in the house and he could not recognize any of the men and did not know who they were He made no attempt at the trial to identify defendant as one of them. He also testified that defendant, who was living with a man whose name he could not recall, about three miles from his home, had worked for him on "two or three short occasions" during the latter part of April and early part of May, the last time having been some five or six days prior to the robbery, and that on said last occasion he had informed defendant that he had "received a little insurance money" and defendant had merely remarked, "That is good."

Mrs. Lola Dalton testified that about the middle of June, 1933, defendant came to her house one evening in company with Howard Deavers, Bessie Deavers Lansdowne, Veneta Deavers, (brother and sisters), and witness's daughter, Ocie Lyle; that Bessie showed witness a new dress she had bought, whereupon defendant handed Bessie a "bill of money" with the remark, "Take this and go buy you a good dress;" that Bessie said, "Pay twenty dollars for a dress?" to which defendant replied, "Yes, ma'am, I have got plenty more of them like that here in my pocket." Witness did not see the denomination of the bill and could not say whether it was one of the large size bills formerly in use or one of the smaller ones now in general circulation. She did not know whether Bessie handed the bill back to defendant or retained it. She also testified that she had not previously known defendant and that Bessie introduced him as "Mr. Woods."

Ocie Lyle testified that on the night she, defendant and Howard Deavers and his sisters visited Mrs. Dalton she met defendant at the home of a Mrs. Moody, who was Howard Deavers' mother, and they went from there first to Mansfield and then to Mrs. Dalton's. It appears from her testimony that defendant was then staying at Moody's. The visit to Mrs. Dalton's was about the middle of June. The Moodys lived in Douglas County, as did Mrs. Dalton. Mrs. Lyle testified that a day or so after the visit to Mrs. Dalton's, Howard Deavers and herself, defendant and Bessie Deavers Lansdowne and Mr. and Mrs. Moody started to Hamburg, Iowa, going by way of Kansas City, Missouri, where they stayed over night with a sister of defendant; that at Kansas City she and Bessie and defendant went into a store to buy Bessie some hose, which she understood defendant paid for; "I didn't see him pay for them. I know he did; he said he was going to. I heard him say if he got her a pair of hose he would have to break a five. . . . I didn't see him give the five and didn't see the change he got back." She did not see defendant buy anything or exhibit any money on the trip to Iowa, but "they said"

that he bore part of the expense of the trip. She further testified that at Kansas City defendant's sister read a letter "to all of them" stating that an old man had been robbed "down here" and that defendant was being accused of the robbery. Prior to that time she had not heard of the robbery. She said that later, while she and her companions were on the way from Kansas City to Iowa, mention was made of some other robbery which they had heard of, in which the robber was said to have used a gun, and Howard and Bessie joked and "kidded" defendant about being braver than the other man, "to rob that old man without a gun." It does not appear that defendant made any response to those joking remarks.

Orville Stamper testified that for five or six months prior to the robbery defendant, who was single, had stayed at his house, making his home there and helping with the work; that he, Stamper, heard about the robbery of Mr. Bray, though he did not say how soon after it had occurred, and that "about that time," defendant left his place, saying that he was not making anything there and had "laid around" long enough and would have to "go out and make something;" that defendant did not take all of his clothes,—"only a change,"—had never sent for the remainder of his clothes and had not come back. He further testified that defendant had stayed at his home in similar manner at former times and once had been gone for about seven years without communicating with him or his family; that defendant's father had been dead since defendant was a small boy and he lived much of his time with relatives in Oklahoma, from which place he had come to Stamper's. It does not appear from the evidence how far Stamper's place is from Mr. Bray's.

The State introduced other evidence tending to show that the officers made search for defendant immediately after the robbery and could not find him. He was finally located in Oklahoma about June, 1934. There was testimony that after his arrest the defendant first told the officers that he had not gone under a name other than his own, but later admitted that he had gone under the name of Woods while in Iowa, stating as his reason that "he didn't want anyone to know he was living with another woman (another man's wife) in Iowa." One officer testified that defendant was asked how much money he had (we presume the question meant when he left, though the record is not clear as to the time), and that defendant "kinder tried to figure up" and said that he did not have over three or four dollars. He gave the officers a detailed account of his movements and whereabouts on the day immediately preceding the night of the robbery and told them where he had stayed that night, viz., at the home of one Sanders, some three or four miles from Mr. Bray's. As we understand the officers' testimony, that was the day defendant had left Stamper's. The account of his movements thus given to the

officers corresponded substantially with defendant's testimony at the trial. It was not contradicted. It was further shown that while staying at Stamper's defendant had occasionally held sales, called community sales, at Ava, the county seat, at which he officiated as auctioneer. He had no money invested in that enterprise. A sale was advertised to be held the Saturday following the Thursday on which defendant left. A Mr. Hepner, who had been associated with defendant in holding those sales, officiated at that sale. Defendant at all times strenuously denied having had anything to do with the robbery.

For defendant, Luther and Burl Sanders, brothers, second or third cousins of defendant, testified that defendant stayed all night the night of the robbery at Burl Sanders' home, having arrived about four o'clock in the afternoon of that day and left the next morning about seven or eight, to go to Moody's. Defendant, testifying in his own behalf said in substance: That he was single, twenty-nine years of age; that his father died twenty-three or twenty-four years ago; that he had a grandfather and three or four uncles living in Oklahoma, where he lived part of the time; had worked for different people, and at different times for Orville Stamper, whose wife was his mother's half sister; that he left Stampers about May 31, 1933; stayed that night at Burl Sanders' and next day went to Moody's where he stayed four or five days and then went to Iowa with the other persons mentioned by Ocie Lyle. He admitted having visited Mrs. Dalton's home but disagreed with Mrs. Dalton as to some of the circumstances relative to the alleged bill offered to Bessie Lansdowne. He said he had a dollar bill, folded up, in his hand and said to her when she exhibited the dress she had bought, which he thought had cost less than a dollar, "Here, why don't you buy a good dress?;" that he did not give her the bill, merely showed it to her; that at his sister's home in Kansas City, where he and the others with him stayed over night, his sister read to them a letter from Mrs. Orville Stamper telling that Mr. Bray had been robbed and that he was accused of having done it; that thereafter, either on the way to Iowa or after they arrived there, Howard Deavers said, speaking of another robbery they had just heard about, "That guy hasn't got as much nerve as you have because you robbed a man without a gun. . . . He was just joking me." He said that Bessie Lansdowne was with him in Iowa and introduced him as Virgil Woods. He was not permitted to state the reason she assigned for so introducing him, which he offered to prove was that she did not want to be living with him under his real name; that after his arrest he first denied to the officers that he had lived under an assumed name because he did not want to "bring these women's names into the show," but that later when he discovered that the officers had learned that he

and Howard Deavers had been "up there living with these women" he concluded that "if the women were already in the deal anyway" he would tell the facts, which he did. He said, "So I told them how it was, that we did go up there and I did go under the name of Woods because this woman was with me and her and her husband was separated and she didn't want him to know who she was with; and, of course, I didn't want them to know I was living with her either." He testified that he did not change his name because of the robbery; that he did not know or hear of the robbery until he and his friends reached Kansas City on their way to Iowa, and that he had had no part in it. He said he had used the name of Woods only for the three or four weeks he stayed in Iowa, except that Bessie Lansdowne so introduced him to Mrs. Dalton; that from Iowa he returned to the home of his sister in Kansas City. He did not say when he went to Oklahoma. On cross-examination he admitted having been "fined a time or two" for petty offenses, the nature of which is not disclosed, but said that he had never been convicted of a felony. Otherwise he was not impeached.

After careful consideration of the evidence in this case we are constrained to hold that it is not sufficient to sustain the conviction. The State's case rests wholly upon circumstantial evidence. In such case the facts and circumstances proven must not only be consistent with each other and with the guilt of the accused but must also be inconsistent with his innocence and must point so clearly and satisfactorily to his guilt as to exclude every reasonable hypothesis of his innocence. [State v. Matticker (Mo.), 22 S. W. (2d) 647; State v. Archer (Mo.), 6 S. W. (2d) 912; State v. McMurphy, 324 Mo. 854, 25 S. W. (2d) 79; State v. Pritchett, 327 Mo. 1143, 39 S. W. (2d) 794.] "Mere suspicion of guilt, however strong, is not sufficient to authorize conviction of crime." [State v. Matticker, supra.]

On the night of the robbery appellant was not seen nor shown to have been nearer the place of the crime than three miles. No money identified as part of that which had been stolen was seen in his possession. It is only by inference from the remark that Bessie Lansdowne is alleged to have made to him that money of similar denomination, a twenty dollar bill, can be said to have been seen in his possession. According to the State's evidence that was two or three weeks after the robbery. Defendant's testimony makes the intervening time shorter, about five or six days after the robbery. In the same conversation, however, defendant said he had plenty more like that bill in his pocket. That may have been mere boasting and untrue. If true it tends to negative rather than to prove that the bill referred to was the one taken from Mr. Bray, who lost only *one* twenty dollar bill. Mrs. Dalton did not see the denomination of the bill and could not describe its size and appearance. No description

of the twenty dollar bill taken from Mr. Bray appears in the record. The reference to "breaking a five" at Kansas City can have but little, if any, probative value. Mr. Bray did not testify that he lost a five dollar bill. Of course defendant *could* have broken a larger bill and thus have obtained a five dollar bill. But to argue thus would be to assume that he had done so and from that assumption to infer that the larger bill was one stolen from Mr. Bray,—a process of reasoning upon which conviction of crime cannot be based. [See State v. Matticker, supra.]

Defendant left Douglas County shortly after the robbery. According to his own testimony he left within five or six days and before he had heard of the robbery. The State's evidence tends to show that it was two or three weeks after the robbery. Defendant also went under an assumed name while in Iowa, and was introduced to Mrs. Dalton by that name just before leaving Douglas County. Flight to avoid arrest and prosecution is a circumstance which may be considered in determining the question of guilt or innocence. The trip to Iowa had probably been planned before the visit to Mrs. Dalton's was made, because the parties started on that trip within a day or so, thereafter. But the evidence affords a plausible explanation for the trip to Iowa and the temporary change of name. It appears from defendant's testimony and may be inferred as well from evidence introduced by the State that defendant, while in Iowa, maintained illicit sexual relations with one of the women with whom he left Douglas County and that such relationship was at least in contemplation when the party left. Attempted concealment of such relationship was not unnatural. It is not for us to pass upon the morality—or lack of morality—of that conduct. Such things do happen. We are concerned only with the question of whether or not the facts and circumstances shown furnish a sufficiently substantial basis for conviction of the crime of robbery for which defendant was on trial.

The fact that defendant, after a sojourn in Iowa, went to Oklahoma, where he was ultimately located about a year after the robbery, may be accounted for under the evidence of the State as well as that of defendant on a theory not inconsistent with his innocence of this charge. The State's evidence shows that he had relatives there with whom, for many years prior to this robbery, he had at divers times and for considerable periods made his home. At one time the Stampers, with whom he had previously stayed for some time and who were related to him, had not heard from him for seven years, although Mr. Stamper testified that when he left, prior to that long absence, he left in a good humor and there had been no friction between them.

In State v. Matticker, supra, a burglary and larceny case, there

was evidence that when, about a month after the crime had been committed, the defendant was halted by officers, he attempted to escape; that there was found at his home, in his possession, property much more closely fitting the description of the stolen property than is shown in the instant case; and that he offered to pay for the stolen property if the prosecution were dropped. That case appears to us a stronger case for the State than the one at bar, but it was there held that the evidence was insufficient. [See, also, State v. Pritchett, supra, a murder case; State v. Archer, supra, larceny.]

Treating as established all the facts and circumstances which the evidence, viewed in its light most favorable to the verdict, tends to prove, it cannot be said that such facts and circumstances are consistent only with defendant's guilt and exclude a reasonable hypothesis of his innocence of the crime charged. At best the evidence raises a suspicion of guilt, but that, as we have said above, is not sufficient to authorize conviction.

From the record before us it appears to us that the State could not make a better case upon another trial. It is therefore ordered that the judgment of the circuit court be and it is reversed and that defendant be discharged. *Westhues* and *Bohling, CC.*, concur.

PER CURIAM:—The foregoing opinion by COOLEY, C., is adopted as the opinion of the court. All the judges concur.