STATE of Missouri, Respondent,

v.

Roger Lee WILLIAMS, Appellant.

No. 58265.

Supreme Court of Missouri,
Division No. 1.

Oct. 14, 1974.

John C. Danforth, Atty. Gen., Karen Iverson, Asst. Atty. Gen., Jefferson City, for respondent.

John E. Bell, St. Louis, for appellant.

WELBORN, Commissioner.

Appeal from judgment and two sentences of life imprisonment entered on jury verdict finding Roger Lee Williams guilty of murder in the first degree and robbery in the first degree by means of a dangerous and deadly weapon.

Francis Kline was the operator of a Shell service station located at 3237 South Grand in the City of St. Louis. At around 4:35 P.M., March 28, 1972, Robert Midyett, who worked at the station, arrived for work. He did not see Mr. Kline. A customer was waiting in an auto for service. Midyett went into the station and noticed that the cash drawer was opened. He closed it and looked in the bay area of the station for Kline. Kline was not there and Midyett then looked in a storeroom. There he found Kline on the floor, shot to death. Ronnie Johnson, the driver of the car waiting for service, was with Midyett when the body was discovered. He placed the time at around 4:30. Police were called and arrived at the scene at 4:43.

A neighbor, Edward Orr II, drove through the station at around 3:00. He saw Mr. Kline and noticed no one else at the station.

At around 3:15 or 3:30, two youths, Joe Woodburn and Gary Strohmeyer were at the station. They passed there on the way to school and knew Mr. Kline. Both saw Kline and another person whom they did not know at the station. At Williams's trial, Woodburn stated that the two boys were at the station a minute or so. He described the man other than Kline as tall, thin, dark-skinned, with dark hair, and wearing a brown coat and pants. When asked whether or not he saw anyone in the courtroom who "resembles" the man he saw with Kline, Woodburn pointed to a spectator.

Strohmeyer testified that he was at the station 15 to 20 minutes on the occasion and saw the stranger with Kline. He said the man came from the back room to the office when they were talking to Kline. He heard no conversation between Kline and the man. Strohmeyer described him as 35 or 40 years old, around 5′9″ to 5′11″ tall, skinny, with dark brown curly hair and wearing a brown corduroy coat. "He was Mexican or something like that." The man was in the office about 10 minutes while Strohmeyer was there. At the trial, Strohmeyer in response to an inquiry as to whether he saw anyone in the courtroom who looked like the man he saw there that day pointed out the defendant.

Dr. Jerome Fontana, a chiropractor, who lived and practiced near the station and who knew Kline, went to the station between 3:00 P.M. and 4:00 P.M. to get cigarettes. Two automobiles were at the pumps. A lady from one of them came into the office while Fontana was getting cigarettes. She was "raising Cain" about the lack of service. Fontana did not see Kline. As he was leaving, a man came out of the shop area, shouting "What do you want? What do you want?" Fontana did not encounter him directly, but as he was walking away he noticed that the man was "pumping" gasoline. He could give no description of the man.

Mrs. Alice Oakes, a regular customer of the station, drove in at 4:00 P.M. or a minute after on March 28. She sat in her car for about five minutes and when no one came out to attend to her, she went into the office and checked the garage area, but found no one. She returned to her auto, stood around for a minute or so and then stepped back into the office. An "elderly gentleman" walked into the office and after some brief remarks by Mrs. Oakes, the man left, walking. Another car also pulled in for service. She returned to her car and waited for about three minutes. Then a man came out of the station and asked, "Who's first?" He waited on the other auto and then serviced Mrs. Oakes's vehicle. He put gasoline in it and checked the oil. Mrs. Oakes paid the man with a $10 bill. He walked into the office and took bills for change from a wallet from his pocket. He gave Mrs. Oakes her change. When she asked for Eagle stamps, the man said, "I guess he took the stamps with him." He told Mrs. Oakes that Kline was "out to lunch."

Mrs. Oakes described the man as 5′7″ or 5′8″, dark complexion, dark hair, brown eyes, medium build, wearing a dark jacket with a sport shirt and "different color of trousers."

At the trial she identified Williams as the man she saw at the station.

Mrs. Sarah Nickles lived on Grand, across the street from the station. At around 4:00 to 4:15 on March 28, she looked out of her window and saw a man standing by the pumps at the station. "[H]e acted like he was washing his hands and wiped them with something and throwed it in the can there by the pump." He walked north on Grand and kept looking back "towards the station." Only the manager's car was at the station at the time.

Mrs. Nickles described the man as between 5′8″ and 6′ tall, 28 to 30 years old, real thin, with dark hair and light complexion. He had on a light blue jacket and dark trousers.

At about 4:30 P.M. on March 28, a man entered the Sure-Way Sandwich Shop, at Grand and Shenendoah, about 10 blocks from the station. He ordered some food and was there about 15 minutes. The woman who waited on him described him as "dark complected," wearing a dark jacket or "T" shirt. At the trial she was unable to pick out anyone who "resembles" the man.

The Pelican Grill is across the street from the Sure-Way Sandwich Shop. William Glenn, bartender at the Pelican, testified that, between 4:00 and 5:00 P.M. on March 28, 1972, there were three customers known to him and one whom he did not know at the Pelican bar. He described the stranger as close to 6′ tall, rather thin, dark hair and eyes, wearing a light jacket or sweater and gray trousers with dark stripes. He had seen the man earlier in the restaurant at noon. When he returned later, he came through and ordered a beer and kept walking "towards the men's room and stayed about 10 minutes or so." He remained standing at the bar about 20 minutes, except for three or four trips to a telephone. George Evans, a customer, was seated near where the man stood. When asked whether he saw in the courtroom the man he saw at Pelican's, Glenn pointed out the defendant. He said, "Looks like him * * * He resembles him. * * * [T]hat second gentleman resembles him in the face." (The transcript does not show at this point that the witness pointed to the defendant, but in his argument defense counsel acknowledged that he had done so.)

Mrs. Ruth Cartledge, a waitress in the bar at the Pelican, testified that when she came to work at around 4:20 on the day in question, she saw a stranger whom she had seen at lunch at the restaurant standing near the service bar. He passed in front of her "and went to the john." When he came out of the restroom, he "may have stayed a few minutes and left." The witness described the man as close to 6′ tall, slender, with black hair, wearing a jacket like a car coat and plaid pants. She could point out no one in the courtroom who "resembles" the man.

John Gude, a patron of the Pelican Bar, testified that when he arrived at the bar at approximately 4:40 P.M., March 28, 1972, he noticed a stranger, a white man. Gude could recall no other descriptive feature. He did notice that the man made frequent trips to the telephone. The man left 10 or 15 minutes after Gude arrived.

George Evans testified that he arrived at the Pelican bar at around 4:00 P.M. A man whom he did not know was standing at the bar when Evans arrived. The man stood next to Evans. Evans described him as a white man, 25 to 30 years old, of medium build, wearing a jacket like a windbreaker below the belt. He saw the man walk back and forth toward the area of the telephone. Evans did not see him go to the restroom. The man left 10 or 15 minutes after Evans arrived. He could identify no one in the courtroom as the man he saw.

At around 5:00 P.M., a patron of the Pelican complained to the owner of the place that the toilet in the men's restroom was not functioning. Nick Laskaris, the proprietor, asked an employee, Clarence Wallace, to check the toilet. Wallace did so and found a wallet and other papers in the tank of the bathroom bowl. Wallace placed the time of his discovery somewhere between four and five o'clock. He turned the wallet and papers over to Laskaris. The billfold and credit cards found in it bore the name of Frank Kline. When Laskaris associated the discovery with the murder, he called police who came to the Pelican at around 6:30. Laskaris turned the billfold over to the police. Search of the restroom by the police uncovered a set of keys and a small aluminum box containing Eagle stamps in a trash receptacle.

Williams was arrested in Texas in April and returned to St. Louis. In the course of interrogation by police officers, he first stated that he "knew nothing about a mur-

der and robbery." Subsequently, according to a police officer:

"He admitted that he had been at the service station and that he arrived there at 2:00 P.M. and that Francis Kline asked if he would take care of the service station to go—while he went and got a cup of coffee and that during that time he had waited on two customers, and I asked him if he knew if they were male or female, if they were white or-colored, or what nationality if he knew. He stated that he didn't remember if they were male or female or black or white—correction—he did say that they were white.

"Q. All right. Did you ask him whether or not he knew or was acquainted with Francis Kline?

"A. He stated that he had known him for quite a long time.

"Q. Did he tell you how long he was at the station?

"A. Fifteen minutes."

On the basis of the inconsistencies in the testimony of the state's witnesses and the failure of several of them to identify appellant either at the trial or in lineups, appellant contends that the trial court erred in failing to sustain his motion for a directed verdict of acquittal at the close of the entire case. Appellant argues that the state's evidence at the best showed only presence at the scene of the crime and opportunity to have committed it and that, as such, it was insufficient for submission of the case to the jury.

■ The state's evidence did place the appellant at the scene of the crime at a time at which it might reasonably be deduced that the shooting of Kline occurred. Kline was last seen alive by the witnesses Woodburn and Strohmeyer at around 3:30 P.M. on the day of his death. Strohmeyer identified appellant as the person whom he saw at the station with Kline. Woodburn did not identify appellant and in fact identified a spectator as a person who "resem-

bled" the man he saw with Kline. This inconsistency does not, however, destroy the probative effect of the contrary testimony of Strohmeyer, which was indirectly corroborated by Mrs. Oakes who saw appellant alone there shortly after 4:00 P.M. Kline's body was discovered at 4:30 P.M. Thus the state's evidence did place appellant at the scene of the crime at a time reasonably related to the death of the victim.

Were this the extent of the state's case, appellant's contention that mere presence alone is insufficient to support a conviction might well dispose of the case. However, the state also sought to connect appellant with the fruits of the crime and that evidence is decisive of the submissibility question.

■ The state's evidence showed that the billfold, credit cards and other personal items of the deceased were discovered at around 5:00 P.M. in the restroom at the Pelican restaurant, some 10 blocks from the scene of the murder. The bartender at the Pelican identified appellant as the man whom he served in the bar and who arrived there between 4:00 and 5:00 P.M. The bartender stated that appellant ordered a beer, went toward the men's restroom and remained there about 10 minutes. The witness did state that he could not see the door to the men's restroom, but this would not preclude his conclusion, later stated, the the man was in the restroom about 10 minutes. The waitress testified that, when she arrived at around 4:25 P.M., a "stranger" passed in front of her and went to the men's "john." The waitress did state at the trial that she saw no one in the courtroom who resembled the "stranger." Her failure to identify appellant does not preclude the conclusion that she and the bartender were referring to the same person, identified by the bartender as the appellant. Both identified the patrons known to them who were in the bar at the time and both referred to a single stranger. Their descriptions of the person as tall, thin and dark-eyed fairly coincide. The

difference between a "light jacket or sweater" and a "car coat" and gray trousers with stripes and plaid pants is not so divergent as to preclude the conclusion that both referred to the same person.

■ The bartender, after pointing out appellant as the man whom he saw, did use the language "Looks like him." "He resembles him." This language does not destroy the probative value of the bartender's testimony. State v. Blackmore, 327 Mo. 708, 38 S.W.2d 32, 34–35 [1, 2] [3] (1931).

■ The testimony of the witnesses at the Pelican was sufficient to link appellant with the discovery there of the personal effects of the deceased and thereby link appellant with the fruits of the crime. Such added element distinguishes this case from cases such as State v. Pritchett, 327 Mo. 1143, 39 S.W.2d 794 (1931); State v. Castaldi, 386 S.W.2d 392 (Mo.1965), and State v. Irby, 423 S.W.2d 800 (Mo.1968).

■ Appellant also points to the inconsistent testimony of some of the state's witnesses and to the failure of persons who had the opportunity to see a person allegedly involved to identify appellant. These matters went to the weight and credibility of the testimony, not to the submissibility of the case, and were for the jury to resolve. State v. Mills, 465 S.W.2d 554, 555 [1] (Mo.1971); State v. Cox, 478 S.W.2d 339, 341 [3, 4] (Mo.1972); State v. Austin, 496 S.W.2d 799 (Mo.1973).

The evidence did make a submissible case and the trial court did not err in failing to direct a verdict of acquittal.

■ Appellant's second ground of error is based upon the trial court's refusal to provide a panel of 47 jurors. Appellant's counsel requested the trial court to call a panel of 47 jurors so that the provisions of § 546.180, subsection 2, (1)(a), RSMo 1969, V.A.M.S., might be applied. The pertinent provisions of that statute are:

"1. In all criminal cases the state and the defendant shall be entitled to a peremptory challenge of jurors as follows:

"(1) If the offense charged is punishable by death or by imprisonment in the penitentiary for life, the state shall have the right to challenge six and the defendant twelve, and no more;

 * * * * * *

"2. Provided, that in all cities which now have or may hereafter have a population of over one hundred thousand inhabitants

"(1) The defendant in every indictment or information for criminal offense shall be entitled to a peremptory challenge of jurors in the following cases, as follows:

"(a) If the offense charged is punishable with death, or by imprisonment in the penitentiary not less than for life, to the number of twenty, and no more;

"(b) If the offense be punishable by life imprisonment, not less than a specified number of years, and no limit to the duration of such imprisonment is declared, to the number of twelve and no more;

 * * * * * *

"(2) In all such trials, the state shall be entitled to the following number of peremptory challenges:

"(a) If the offense charged is punishable with death, or by imprisonment in the penitentiary not less than for life, to the number of fifteen, and no more;

"(b) If the offense be punishable by life imprisonment, not less than a specified number of years, and no limit to the duration of imprisonment is declared, to the number of ten and no more; and in all other cases, four and no more."

Section 546.210, RSMo 1969, V.A.M.S., requires a panel of twelve more members than the number of peremptory challenges. St. Louis, where the trial was held, is a city of more than 100,000 inhabitants, so

that this case directly involves the provision applicable to such a city.

Relying upon an unreported order of this Court en Banc in Jackson v. Tillman, No. 58029, dated July 19, 1972, the trial court concluded that a panel of 34 was all that was required, and, over appellant's objection, such a panel was qualified. Relying primarily on State v. Kinne, 372 S.W.2d 62 ■ (Mo.1963), appellant assigns the failure to qualify a panel of 47 as error. In that case, the court held that on a trial for first degree murder in Kansas City where the state waived the death penalty "the plain mandate of the statute" required a panel of 47 jurors, and that reversible error was committed when, over the defendant's objection, a panel of only 34 was called.

This case was tried after the decision of the United States Supreme Court in Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), so that the possibility of a death sentence did not exist. However, the sole remaining punishment upon a finding of guilt of murder in the first degree was life imprisonment (§ 559.030, RSMo 1969, V.A.M.S.), calling into play the requirements of subdivision 2 of § 546.180, dealing with an offense charged which is punishable "by imprisonment in the penitentiary not less than for life * * *." See State v. Yandell, 201 Mo. 646, 100 S.W. 466 (1907).

The trial court's reliance on the order in Jackson v. Tillman was misplaced. In that case, the state, subsequent to the decision in Furman v. Georgia, supra, was seeking to obtain a 47 member panel in a first degree murder case and to qualify the members for the death penalty, and then ask for the death penalty on the trial. The trial court indicated agreement with the state's position and the defendant sought a writ of prohibition. The Court en Banc did issue its order that a writ of prohibition would issue unless the trial court should deny the request of the state (1) that a panel of 47 jurors be qualified and (2) that the state be permitted to qualify the jury for imposition of the death penalty. In response to this order, the trial court ordered a panel of 32 members and that the state not be permitted to qualify the panel for the death penalty. Examination of the file in that case shows clearly that the thrust of the relator's objection was to the qualification of the panel for the death penalty. The order of the Court en Banc did call for denying the request for a panel of 47, but it did so conjunctively with the refusal of the right of the state to qualify the panel for the death penalty. The order in that case did not have the effect of overturning the Kinne case, supra, and that case requires the conclusion that the trial court's failure to qualify a 47 member panel for the trial of the murder count was reversible error.

■ Neither appellant nor the state has directed specific attention to the effect of such error on the trial of the armed robbery count, on which appellant was also found guilty. It seems clear that, with the abolition of the death penalty, the size of the panel for a charge of armed robbery, for which the punishment is now not less than five years' imprisonment (§ 560.135, RSMo 1969, V.A.M.S.), is determined in St. Louis by the provisions of § 546.180, subsection 2, relating to charged offenses, "punishable by life imprisonment, not less than a specified number of years, and no limit to the duration of such imprisonment is declared * * *." In such instances, a panel of 34 would be required, with the defendant having 12 peremptory challenges and the state 10. Such has been the holding in prior cases in which the state waived the death penalty in an armed robbery case. See State v. Redding, 357 S.W.2d 103, 108 [9, 10] (Mo.1962); State v. Barrett, 406 S.W.2d 602, 603 [2] (Mo. 1966).

■ Thus, had the only charge in this case been the armed robbery charge, the panel provided would have been all that was required. However, the state elected to take advantage of Rule 24.04, V.A.M.R.,

and to charge both murder and armed robbery in the same information and to try the defendant on both charges at the same trial. The state having done so and receiving the benefit of having the jury hear the entire evidence involving both offenses, there is no way by which it might be determined to what extent the failure to accord the defendant the challenges to which he was entitled on the murder charge also prejudiced his trial on the robbery. The two charges were so interwoven that the outcome of the murder charge would most likely determine the outcome of the robbery charge. In such circumstances, both convictions should be reversed because of the failure to provide the jury panel to which the appellant was entitled.

Reversed and remanded.

HIGGINS, C., concurs.

PER CURIAM:

The foregoing opinion by WELBORN, C., is adopted as the opinion of the court.

All of the Judges concur.