THE STATE v. BYRON WOLFF, *alias* JERRY WOLFF, Appellant.—87 S. W. (2d) 436.

Division Two, November 5, 1935.

*Loyd E. Roberts* and *Russell Mallett* for appellant; *Julius Meyer-hardt* of counsel.

*Roy McKittrick,* Attorney General, and *W. W. Barnes,* Assistant Attorney General, for respondent.

COOLEY, C.—By information filed in the Circuit Court of Jasper County this defendant and five others, Ledrew B. Harmon, Charles Napper, Victor Earl Powell, William B. Moors and Glenn Harmon, were charged with murder in the first degree for the alleged killing of Brooks L. Van Hoose, whom for convenience we may refer to as the deceased. Defendant was convicted and sentenced, in accordance with the verdict, to life imprisonment and has appealed. The principal question presented by the appeal is whether or not there is sufficient evidence to sustain the conviction. This necessitates a more complete *resume* of the evidence than would otherwise be necessary. The State's evidence tends to prove the following:

Mr. Van Hoose lived alone, in the country, about five miles southwest of Carthage, Missouri. His residence was on a plot of ground some two hundred feet square. Along the north side of the premises there is a street car track running east and west, and immediately north of and parallel with that track there is a graveled highway called the Morgan Heights Road. Intersecting that road there is a north and south graveled road on the west side of the Van Hoose premises. About a mile north of said premises the north and south road joins paved highways 71 and 66, which are there coincident. At the time in question Ledrew B. Harmon, referred to in the evidence as L. B. Harmon, owned property located adjacent to the said north and south road north of the Van Hoose residence and between it and the junction of that road with highways 71 and 66. Its exact location is not clearly shown but it appears to be nearer to said junction than the Van Hoose residence. It appears, however, that Harmon was not then living at said place but was living in Carthage.

On the west side of the Van Hoose house there is a semicircular driveway from and back to said north and south road, passing close to the house and under a ''portico''—porte-cochère—which extends from the house above the entrance door on that side. That door opens into a hall or ''vestibule'' about six feet long east and west and about four feet wide, from the north side of which there is an opening, without a door, into a large room extending the length of the house on the north side, spoken of as the north room. Deceased's body was found in that room.

Deceased was last seen alive about six o'clock P. M. March 3, 1934 (a Saturday), when he left his office in Carthage. His automobile, however, presumably with him in it, was seen driving up to his residence at about seven o'clock that evening. Whether it had more than one occupant is not shown.

About noon the next day a Mr. Murray went to deceased's home to return a borrowed trailer. The house was closed and Murray was unable to arouse anyone. At that time deceased's automobile was standing, facing south, under the ''portico'' and immediately in front of the west door. Murray noticed a hole, later discovered to be a bullet hole, in the left door—that next to the house. The following morning, Monday, March 5th, Murray was driving by the Van Hoose house, and, seeing the automobile still in the same place, he stopped, went to the door and called. Getting no response and being unable to open the door, he proceeded to Carthage and notified friends of deceased, who went to the house. The outer doors were found locked. The west door was fitted with a lock which, when the door closed, locked the door automatically to a person seeking to enter from the outside but the door could be opened from the inside by turning the door knob. It was found so locked. Entrance into the house was effected through a window.

Deceased's body was found lying on the floor in the north room near the opening or doorway between that room and the vestibule. Deceased was fully clothed and his eyeglasses were in place. Two bullet wounds were found upon the body. One bullet had struck him in the right chest, passed through the body and had evidently struck the east wall of the vestibule and fallen to the floor where it was found. The other bullet had struck him in the left shoulder, passed nearly through the body and lodged therein. Both were steel jacketed, 32-caliber bullets, such as are usually fired from an automatic pistol. On the floor by deceased's left side was found deceased's revolver, which he had been in the habit of carrying—a 38-caliber weapon using leaden bullets. It was fully loaded except for one chamber, that directly in front of the hammer, which had been discharged. On the floor of deceased's car was found a 38-caliber leaden bullet corresponding to those found in deceased's revolver. It had passed through the car door, ranging somewhat downward. The

indications were that it had been fired from the west doorway of the house and that deceased's assailant or assailants, when firing the shots that killed him, must have been west of deceased, perhaps in or just outside the doorway, since the bullet that passed through his body had struck the east wall of the vestibule.

The bed in deceased's bedroom was somewhat "rumpled," as though it had not been made up after last having been slept in. Otherwise everything in the house was in order, as was the clothing on deceased's body. Nothing had been stolen, nor were there any indications of attempted theft or robbery. A valuable diamond ring which deceased had been in the habit of wearing was still on his finger and some money was found in the pockets of the clothes he had on. Two electric lights, one in the vestibule and one in the living room, were burning.

The coroner, Dr. Hogan, who examined the body of deceased about noon on March 5th testified that in his judgment deceased had then been dead between thirty-four and thirty-six hours; that he thought he could tell the length of time within two to six hours. He further said that from the nature of the wounds he thought deceased had probably lived an hour or an hour and a half after being shot.

Several witnesses testified that they had heard deceased speak of having been threatened. One witness said that about a year before his death Van Hoose pointed out to him "a man" who had threatened "to get him." Another witness said that "about a year or so ago some person indirectly stated they were going to try to rob him." Another testified that in November, 1933, Van Hoose reported to officers that he had been informed "some persons" were planning to rob him of his diamond ring. It appears also that about a year before his death he had been robbed of his diamond ring, which, in some way not disclosed, he had recovered. There is no evidence tending to connect defendant or any of the persons charged jointly with him with any of those threats or with said robbery.

The State's theory at the trial seemed to be that defendant and the others charged with him had entered into a conspiracy to rob Van Hoose and had killed him in attempting to carry out that conspiracy. The testimony by which the State sought to show such conspiracy and to connect defendant with the killing was mainly that of two witnesses, R. E. Dugan and one of the original defendants, Charles Napper, whom the State called as a witness, after having dismissed the prosecution as to him. From Dugan's testimony it appears that he operated a tourist camp called Sleepy Hollow Camp on Highway 66, about three miles east of Carthage; that on March 3, 1934, between three and four o'clock P. M., defendant, Glenn Harmon, Powell and Moors came to his place in a Ford V8 sedan. Harmon and Moors got out of the car and entered Dugan's restaurant. Powell and defendant drove away in the direction of Carthage.

About forty-five minutes later they returned, bringing with them L. B. Harmon, and those three also entered the restaurant. Very soon Glenn and L. B. Harmon (who were brothers and had not met for a long time) retired to an adjoining room where they remained for an hour or so, when they returned to the room where the others had remained and all five men went out of the restaurant and "gathered in a group" near the northeast window. Dugan remained in the restaurant. He said there was a small crack under the window and he could hear the men talking while they thus stood grouped outside near the window. He related the part of the conversation he had heard thus: "I heard L. B. Harmon tell them to be on the road by his place at nine-thirty." "I heard L. B. Harmon say they would meet them at the road that passes by his place and then someone, I can't say which one, asked, 'What about this lay out?' and then Harmon spoke up and says, 'That's all right, I know all about that.'" At that time Dugan could see through the crack under the window (it appears the window was too high for him to look through it) L. B. and Glenn Harmon and Powell, but not Moors or this defendant, and the only voice he identified was that of L. B. Harmon. The only other conversation between any of the men which he testified to was this remark, made by L. B. Harmon to his brother Glenn while they were together in the room adjoining the restaurant room, "Well, I will pay you just as soon as I can." He did not hear Van Hoose's name mentioned by any of the men and heard no mention of robbery or other crime.

After conversing, as above stated, outside the restaurant the men all came back into the restaurant and very soon L. B. Harmon "took the car and drove to Carthage," and after a short absence returned, bringing with him Charles Napper. About seven-thirty that evening the six—this defendant, L. B. and Glenn Harmon, Powell, Moors and Napper—all left together in the Ford V8 sedan, going toward Carthage. They did not come back.

In this connection Purl Stemmons testified that "somewhere around four o'clock" that afternoon defendant came into his restaurant in Carthage and "asked me if my name was Harmon, but I misunderstood him. . . . I understood him to ask if I knew (L. B.) Harmon. . . . I said, 'yes.' He said he wanted to speak to me. We moved up to the front a little bit. . . . He said, 'The women will be out to the same place they were before.'" Upon being informed that he was not speaking to Harmon defendant inquired where he could find Harmon and was told that he lived back of the restaurant. He asked Stemmons to call Harmon, which Stemmons did.

Defendant and Harmon left the restaurant and soon thereafter witness saw them driving away in a car, in which there was also a third man whom Stemmons did not recognize. That man was doubt-

less Powell, who had left Dugan's restaurant with defendant for about forty-five minutes, returning with L. B. Harmon, as we have related.

Napper testified that about seven P. M. on March 3rd, in a restaurant in Carthage, he met L. B. Harmon, whom he knew, and the defendant whom he had not previously known. There were some other men present whom he did not know. While there they all drank some beer and in the course of their conviviality Napper, in paying for some drinks, exhibited his money, about $30. Harmon invited Napper to "stick around and we will take a ride somewhere," which invitation was accepted. One of the other men said something to Harmon which Napper did not hear and then Harmon said to Napper, "We will go out in these boys' car." Presently they went to the car and according to Napper's testimony he and Powell got into the back seat and defendant and L. B. Harmon in the front seat. He does not at this point mention Moors and Glenn Harmon. He said that after driving east some distance the car was stopped and L. B. Harmon and defendant got out and held a conversation, part only of which he heard, viz., Harmon saying in a raised voice, "You can't do that." "After a bit" Harmon and defendant got back into the car and the party proceeded to Dugan's place where they all got out. There he said there were "two other men who had joined these two strangers that I went out with." Asked to name all who were then in the party, he having stated that he had since learned their names, he named defendant, L. B. and Glenn Harmon, Powell, Moors, and himself. He said that all six left in the Ford V8 sedan and drove back to Carthage. Omitting details, here immaterial, he testified that he expressed an intention to go home, whereupon L. B. Harmon suggested that it was yet early and that they, he and Harmon, take a ride by themselves, to which he assented and they left in Harmon's car, an Auburn, going west on Highway 66. He understood they were going to Joplin. He said that, without explanation, Harmon, who was driving, turned off the paved highway and drove south on the north and south graveled road which we have described above as running past the Van Hoose residence; that he drove to the intersection of that road with the Morgan Heights Road above described, turned around and drove back north "a hundred feet or more," pulled out to the left side of the road and stopped the car, but left the lights burning and the engine running; that Harmon appeared to be watching a car that was approaching from the north; that when said approaching car neared Harmon's car it slowed down somewhat and he recognized it as the Ford V8 sedan he had been in earlier in the evening and recognized the occupants as defendant, Glenn Harmon, Powell and Moors; that "in a minute or a few seconds" after the Ford V8 sedan had passed L. B. Harmon got out of his car, leaving the motor running, and

"went around to the rear" of his car; that in "a few minutes,"— not to exceed ten minutes, Harmon came back, got into his car "without any explanation as to his disappearance," and drove away northward to Highway 71 and 66, thence westward and to Joplin; that he himself had not gotten out of the car. He further testified that while he was sitting in Harmon's car near the Van Hoose residence and after the V8 sedan had passed, "the noise of the car (the V8) was lost and then picked up a little bit later;" that it went out of his hearing for a while and then again he heard it. He said that the windows of the car in which he sat were closed; that he did not hear Harmon talking to anyone while he was out of the car, did not know what he was doing back of the car; that once, after Harmon had got back into the car he, Napper, looked back through the rear window but could see nothing of the car that had passed—could not see its light; that was after the noise of the "Ford" (V8 sedan), had briefly died away and started up again.

On cross-examination he said that Harmon had driven south on the graveled road "between a quarter and a half mile" from the paved highway before stopping, which would put the place where he stopped and was passed by the other car a half mile or more north of the Van Hoose residence; that the other car, the V8 sedan, did not stop. He placed the time at which the cars met and passed each other at about nine o'clock P. M. He did not testify to having heard any shots.

Mrs. Hackett, who lived in a house on the north side of the Morgan Heights Road and "a little bit east" of the intersection of that road with the north and south road that passes the Van Hoose residence, testified that on the night of March 3rd, "between eight and nine o'clock," she heard shots from the direction of the Van Hoose house. She could not fix the time more definitely and she did not say how many shots she had heard. At the time she was in her dining room and the windows and doors of her house were closed. On cross-examination she said that at first she thought the sounds she had heard were the backfiring of an automobile; that at first she paid no attention; "I mentioned it to my aunt, and I don't believe we did anything until we heard them the second time; then we got up and looked out the window." She did not testify that she saw anything when she looked.

Defendant left the community soon, evidently almost immediately, after Van Hoose was killed. It is not shown that he resided thereabout. He was arrested in Los Angeles, California, and brought back to Jasper County, Missouri, in the latter part of March, 1934. Oll Rogers, sheriff, who brought him back, testified that on the way defendant first told him that he was not in Jasper County on March 3rd, but later admitted that he had been there and had been at Sleepy Hollow Camp, but had not been "any farther than Carthage" and

from Carthage had gone back to Kansas City, from which place he had come to Carthage. He testified that defendant told him that he, Victor Powell and Glenn Harmon, whom at the time he knew as Dick Hunt, had been together in Colorado and had come together to Kansas City, where they fell in with Moors, who was a taxi driver and who drove them to Carthage and thence to Sleepy Hollow Camp; that he and Powell went back to Carthage for L. B. Harmon and brought him to the camp; that after staying around there "quite a bit" they all went back to Carthage and that Napper "was with them down there;" that from Carthage they went back to Kansas City.

Over defendant's objection Rogers testified, in answer to a question as to what if anything defendant had said while they were at Carthage concerning Napper, "Well, he said they got Napper in the car and they went out east across the river some place, and they were figuring on 'sticking Napper up;' " that that suggestion came from defendant himself. Rogers further testified that defendant told him that while he and the others were in Jasper County on March 3rd he had a twenty-two-caliber pistol, "just a little toy pistol," and that Harmon had a "thirty-eight automatic" and that so far as he knew those were the only guns "in the crowd." Rogers testified that defendant further told him that from Kansas City he went to Denver where he heard that "they were after him on the murder charge" and he went to Los Angeles, California, where he moved about from one place to another (in the city) two or three times because he had seen pictures of himself and Harmon in a Denver paper. Rogers testified that at all times defendant denied having had anything to do with the killing of Van Hoose and said there had been no attempt to rob anybody. A twenty-two-caliber pistol was found on defendant and taken from him when he was arrested in Los Angeles.

Defendant did not take the witness stand. The only evidence he introduced was the testimony of two witnesses tending to show that Napper was intoxicated on March 3, 1934, during the time covered by his testimony. Witnesses for the State gave similar testimony.

We have epitomized at length the evidence that might be regarded as bearing upon the question of conspiracy and defendant's connection with the homicide, omitting details corroborating the principal witnesses as to the movements of defendant and his companions and their presence at the places mentioned by said witnesses—details which could throw no additional light on the question to be determined.

In our opinion the evidence is insufficient. It leaves too much in the realm of conjecture. It is well-settled law that when, as here, the evidence is wholly circumstantial, the circumstances, to warrant conviction, must be consistent with each other, must tend

to prove guilt, and not only must be consistent with the hypothesis of the defendant's guilt, but must be inconsistent with every other reasonable hypothesis, including the hypothesis of his innocence. [State v. Pritchett, 327 Mo. 1143, 39 S. W. (2d) 794, 797.] In that case (39 S. W. (2d) 1. c. 797), this court quoted with approval from State v. Morney, 196 Mo. 1. c. 50, 93 S. W. 1. c. 1119, "Where a chain of circumstances leads up to and establishes a state of facts inconsistent with any theory other than the guilt of the accused, such evidence is entitled to as much weight as any other kind of evidence; but the chain, as it were, must be unbroken, and the facts and circumstances disclosed and relied upon must be irreconcilable with the innocence of the accused in order to justify his conviction." That rule is too well established in this State to require multiplication of authorities. The evidence in this case does not measure up to the requirements of that rule.

No motive was shown unless it were robbery. Evidently, judging from the threats that had been made, deceased had had enemies who desired his undoing, and it appears also that there were persons who coveted his diamond ring and had once relieved him of it. But there is no evidence that defendant or any of his alleged coconspirators had made any of those threats or had had any connection with such robbery. Said threats and prior robbery, therefore, cannot be considered as tending to show motive on the part of defendant. If robbery were the motive it seems rather strange that the purpose was not carried out. It may be surmised that Van Hoose met his assailants at the door in fighting mood and fired at them and that when they had mortally wounded him they became frightened or panic stricken and fled without pausing to accomplish the purpose which had brought them there. But that is only surmise. And if defendant and his alleged coconspirators were so criminally minded as to have deliberately conspired to rob deceased and had started out on that mission, it would seem that they would have contemplated using such force as might be necessary and would not have abandoned their purpose when they could so easily have accomplished it. According to Napper's testimony there were four men in the V8 sedan when it passed Harmon's car. The State's theory seems to be that those four were on their way to deceased's home to rob him. It would have taken but a moment to have snatched the diamond ring from his finger after he was shot and mortally wounded.

The testimony of Napper places defendant and three companions on the north and south graveled road, going toward the Van Hoose residence, at about nine o'clock on the night of March 3rd. Van Hoose was evidently killed that night, but the exact time could not be fixed. It was evidently after seven o'clock, because his car was seen driving up to the house at about that time. But how long after? Dr. Hogan testified that when he examined the body about noon on

March 5th, he thought deceased had been dead thirty-four to thirty-six hours. If the time was thirty-six hours death had occurred about midnight March 3rd; if thirty-four hours it had occurred two hours later. Dr. Hogan also thought that the stricken man might have lived an hour or an hour and a half after being shot which would place the time of the shooting at about ten thirty or eleven (if deceased had been dead thirty-six hours at the time of Dr. Hogan's examination)—too late to fit in with the theory, based on Napper's testimony, that when defendant and his companions passed Harmon's car at nine o'clock they were on their way to the Van Hoose residence. True, Dr. Hogan said he could only estimate within a few hours the time that had intervened between the death and his examination, and Napper was estimating, rather than fixing exactly, the time when the V8 sedan passed Harmon's car; so that, on this phase of the case, the time factor alone does not preclude the possibility that the V8 sedan passed Harmon's car going toward the Van Hoose residence before deceased was shot. But Napper said the V8 did not stop; that the noise of its motor died down for a little while and then started up again. Evidently the car went on. Napper heard no shots. The windows of the car in which he sat were closed, but he heard the running noise of the other car and if he heard that he certainly could have heard shots had there been any while he was thus close.

Mrs. Hackett heard noises "between eight and nine o'clock" which she at first took to be the backfiring of an automobile, and later concluded were shots. Her testimony gives the impression that there were two groups of noises—she speaks of both in the plural—separated by a sufficient interval of time for her to have commented to her aunt about it after hearing the noises the first time and before she heard "them" the second time. It is apparent, we think, from the circumstances we have related, that but three shots in all were fired—one by Van Hoose and two by his assailant or assailants—unless, of course, the latter fired some that missed their target. No evidence was found of other shots having been fired in or against the house. In view of all the circumstances it seems highly probable that those three shots were fired close together. If Mrs. Hackett heard two groups of noises, separated by an interval of time sufficient to allow for comment to her aunt after the first and before the second, may she not have been right in her first thought they were the backfiring of an automobile, or at least may they not have been noises other than the shots that killed Van Hoose?

The State's theory appears to be that the two Harmons, Powell, Moors and the defendant planned the robbery of Van Hoose while at Sleepy Hollow Camp, on the afternoon of March 3rd. Dugan overheard a part of their conversation but he heard no mention of robbery or other contemplated crime nor was there any reference to

Van Hoose. Assuming that when L. B. Harmon told the others to meet him in the road by "his place" at nine thirty he referred to his place on the north and south graveled road (although he then lived in Carthage), Dugan heard nothing indicative of the purpose of the suggested meeting. The question "What about this lay out?" and the answer, "That's all right, I know all about that," may or may not have had reference to a proposed crime, and if it be inferred that they did refer to some contemplated criminal act then it must be further inferred that such act was the robbery or murder of Van Hoose. The language used could as well have had a non-criminal as a criminal import. In this connection it will be recalled that before that conversation occurred defendant and Powell had gone to Carthage and brought L. B. Harmon back with them; that defendant did not then know L. B. Harmon, and that in speaking to Stemmons *in the belief that Stemmons was Harmon,* the message he delivered was "The women will be out to the same place they were before." It is only by guessing that the conclusion can be reached that that message carried a secret and sinister meaning other than its words imported which was understood by Harmon without explanation or, so far as the evidence shows, prearrangement. If the message was not intended to be understood to refer to women, as it purported, but was merely designed to procure Harmon's presence at a conference to be held at Sleepy Hollow, it would seem that it would have been just as easy and more natural simply to have requested Harmon to come to Sleepy Hollow, or to have informed him that his brother, whom he had not seen for a long time, was there and wanted to see him. At any rate, it is only by guessing that said message can be said to indicate a criminal design.

Again, if the five men congregated at Sleepy Hollow on the afternoon of March 3rd there conspired to rob Van Hoose that night, as appears to be the State's contention, why did they take Napper along when they started out to accomplish that nefarious design? Under the evidence, if there was such conspiracy it must have been concocted at that time and place. Napper was not then present. He was a stranger to all of the parties except L. B. Harmon and had never engaged with the latter in any criminal enterprise. While he admitted having once pleaded guilty to a charge of embezzlement of some insurance company's funds, he was, at the time here involved, employed in an office of the State Highway Department and is not shown to have borne a bad general reputation nor to have been the associate of criminals or persons of bad character. The State has abandoned its original contention that he was one of the conspirators and used him as one of its chief witnesses. According to his testimony he had no part in any conspiracy but met the alleged conspirators later and by chance at Carthage and it was at the invitation of L. B. Harmon that he joined the party, rode around

with them for awhile and remained with Harmon while the latter drove to the rendezvous near the place where, it is claimed, the crime was to be committed. If, as Rogers testified defendant told him, the others designed robbing Napper, a reason can be seen for keeping him with them. But if they had planned and intended robbing Van Hoose it is difficult to understand why they did not let Napper go on home when he expressed his intention of doing so.

The facts and circumstances shown by the evidence are not irreconcilable with defendant's innocence of this charge. The road on which Napper testified he saw defendant the night of the homicide is a graveled public highway over which, doubtless, many persons traveled. Van Hoose lived alone. There was ample opportunity for some person or persons other than defendant and his companions to have come to his house and killed him. He had enemies who had threatened him and he had once been robbed.

In State v. Pritchett, supra, the circumstances pointed at least as strongly to the defendant's guilt as in this case, but we held the evidence insufficient. We there said, 327 Mo. l. c. 1149, 39 S. W. (2d) l. c. 797:

"It matters not that there is no evidence tending to show that some person other than the defendant killed Frossard. That there was opportunity for some other person to do so cannot be gainsaid. True, the evidence raises a strong suspicion of the defendant's guilt. But, mere suspicion, however strong, cannot take the place of evidence, and a verdict based upon mere suspicion will not be permitted to stand. [State v. Nagle (Mo.), 32 S. W. (2d) 596; State v. McMurphy, 324 Mo. 854, 25 S. W. (2d) 79; State v. Matticker (Mo.), 22 S. W. (2d) 647; State v. Buckley, 309 Mo. 38, 274 S. W. 74; State v. Morney, supra.]" That statement is applicable to the instant case. See, also, State v. Tracy, 284 Mo. 619, 225 S. W. 1009, wherein the defendant denied having been at certain places where the State's evidence showed him to have been; State v. Matticker, cited, supra, in the Pritchett case, wherein there was evidence of attempted flight; State v. Archer (Mo.), 6 S. W. (2d) 912, wherein the defendants gave false testimony in attempting to prove an alibi. In the latter case we said, 6 S. W. (2d) l. c. 914:

"But the State cannot make its case upon the weakness of appellants' case. It must stand or fall on the strength of its own case, except as appellants' evidence may aid that of the State in establishing facts tending to show guilt. The falsity of appellants' testimony tending to show that they were not in the public road an eighth of a mile from the truck, in view of the presumption of their innocence, has no tendency to prove that they were at the truck and removed and carried away the tires therefrom."

In the Tracy, Matticker and Archer cases, as in the Pritchett case, the evidence raised strong suspicion of guilt but was held insuf-

ficient to justify conviction. So, for like reason, we are constrained to hold in the instant case.

The State may be able, at another trial, to produce additional evidence tending to prove defendant guilty; if not the prosecution must fail.

█ In the event of another trial we think the testimony of Rogers to the effect that defendant had told him he and his companions had "figured on" robbing' Napper should not be admitted if objected to. The statement did not tend to prove a conspiracy or an attempt to rob Van Hoose and it may have operated to defendant's prejudice by instilling in the minds of the jurors the thought that defendant was criminally minded and therefore likely to have planned and attempted the robbery of Van Hoose. █ Generally, proof of other crimes is not admissible unless such proof tends to establish the charge for which the defendant is on trial. The rule is elucidated in State v. Buxton, 324 Mo. 78, 22 S. W. (2d) 635, q. v. The State seeks to justify the admission of that testimony on the theory that it was part of a conversation relating to the offense for which defendant was on trial and that the State was entitled to prove the whole conversation, and cites State, v. Hardin, 324 Mo. 36, 21 S. W. (2d) 758; State v. Lovell, 235 Mo. 343, 138 S. W. 523; and State v. Ware, 62 Mo. 597. The latter case is not in point. In State v. Lovell, the State had introduced part of a statement which the defendant had made relative to the alleged offense and the defendant then offered to prove other portions thereof. The offer was refused. It was correctly held that such proof should have been admitted. That case is clearly distinguishable from the case before us. In the Hardin case the court makes the general statement that the State was entitled to prove all that the defendant had said to the officer who arrested him, citing, without discussion, State v. Lovell, supra, and 16 Corpus Juris, 723, section 1481.

In the Hardin case, however, the court held that the major part of the statement complained of related to the offense for which defendant had been arrested and was on trial, and said that the remainder was a garrulous remark that was probably nonprejudicial. We are inclined to think that the whole statement had such relation to the offense charged as to make it competent, in which respect that case differs from the instant case.

In 16 Corpus Juris, 723, section 1481, it is said that when the State has introduced a confession the accused has the right to have the whole statement or conversation containing it go to the jury and that it is permissible for the State to prove the entire confession and "the conversation containing it," citing in support of the statement we have quoted, Richardson v. Commonwealth, 166 Ky. 570, 179 S. W. 458, and Gleason v. State (Tex. Cr.), 183 S. W. 891. In both

those cases there existed reasons for holding the evidence there in question competent which distinguished them from the case at bar.

In the same section of Corpus Juris it is further said: "While it is no valid ground of objection to the admission in evidence of a confession by the accused that the language indicates that he had also committed another and separate offense, yet when the part bearing on the issue can be separated from the parts relating to other offenses, only that part material to the issue is admissible." In the instant case the part of defendant's statement material to the issue on trial could have been so separated.

Other matters complained of will probably not occur on another trial. The judgment of the circuit court is reversed and the cause is remanded. *Westhues* and *Bohling, CC.*, concur.

PER CURIAM:—The foregoing opinion by COOLEY, C., is adopted as the opinion of the court. All the judges concur.