THE STATE v. BYRON WOLFF, Appellant.—101 S. W. (2d) 973.

Court en Banc, February 19, 1937.

*Julius M. Meyerhardt, L. W. Rodekohr* and *W. H. Foulke* for appellant.

*Roy McKittrick,* Attorney General, and *Wm. Orr Sawyers,* Assistant Attorney General, for respondent.

COOLEY, C.—By information filed in the Circuit Court of Jasper County Byron Wolff and five others, L. B. Harmon, Charles Napper, Victor Earl Powell, William B. Moors and Glenn Harmon (brother of L. B.) were charged with murder in the first degree for the alleged killing, on March 3, 1934, of Brooks L. Van Hoose. A severance having been granted this defendant was tried alone, convicted and sentenced to life imprisonment. Upon his appeal to this court said judgment was reversed for lack of sufficient evidence. [See State v. Wolff, 337 Mo. 1007, 87 S. W. (2d) 436.] The cause was again

tried in March, 1936, and defendant was convicted of murder in the second degree, sentenced in accordance with the verdict to ten years' imprisonment in the penitentiary and has again appealed. This appeal presents but one question, viz., the sufficiency of the evidence. There are other assignments of alleged error in defendant's motion for new trial. We have examined them and find them without substantial merit, but shall not discuss them because defendant, in his brief here, has expressly waived all contentions except that the evidence was insufficient to warrant submission of the case and to sustain the verdict. On the second trial there was additional evidence, consisting of statements made by the defendant while his first appeal was pending, and some variations in the testimony of certain witnesses from that given on the first trial; also some testimony which in our former opinion we indicated should not have been admitted was not offered—the latter fact, however, not affecting the question of submissibility of the case. These differences in the evidence will be referred to later, as may be necessary. Except as thus indicated the evidence on the second trial was substantially the same as on the first. In our opinion on the first appeal, State v. Wolff, supra, we stated the facts at length and in detail, for which reason a less detailed statement will suffice here. The former opinion may be read in connection with this, for complete details of the facts.

The State's evidence on this trial tended to show the following: ■ Van Hoose, the deceased, lived alone, in the country, about five miles southwest of Carthage. Along the north side of his premises and near his house is a street car track running east and west and immediately north of and parallel with said track is an east and west highway known as the Morgan Heights Road. Intersecting that road there is a north and south graveled road on the west side of the Van Hoose residence which, about three quarters of a mile north of said residence, joins or intersects paved Highway No. 66. L. B. Harmon owned a place and had formerly lived on said graveled road between the Van Hoose residence and Highway 66, but at the time in question was living in Carthage.

On the west side of the Van Hoose house there is a driveway extending in a semicircular manner from the northwest corner to the southwest corner of the yard, passing close to the house and under a portico which extends from the west side of the house above the west entrance door. This west entrance door opens into a vestibule or hallway about six feet long east and west and about four feet wide, from the north side of which there is an opening, without a door, into a large room extending the length of the house on the north side, spoken of as the "north room." The body of deceased was found in this north room on the morning of March 5, 1934.

Deceased was last seen alive about six o'clock on Saturday evening,

March 3, 1934, when he left his office. An automobile, presumably deceased's and presumably with him in it, was seen driving up to his residence about seven o'clock that evening.

On the following day (Sunday), a Mr. Murray went to the home of deceased to return a borrowed trailer. Murray was unable to arouse anyone in the house. He noticed the automobile of deceased standing in the driveway, facing south, under the portico and directly in front of the west side entrance door. At that time, he noticed a hole (shown to be a bullet hole) in the left door of the deceased's car—that side nearest to the house. The following morning (Monday, March 5, 1934), Murray was driving by the Van Hoose house, and seeing the deceased's car still in the same place, he stopped, went to the door and tried to arouse the occupants. Getting no response and being unable to open the door, he proceeded to Carthage and notified friends of the deceased, who went to the house. The outer door was found locked. The west door was fitted with a night lock which, when the door closed, would lock the door automatically. The screen door attached to the west entrance did not have any lock or fastener. Entrance into the house was effected through a window. There was no bullet hole through the west door or the screen door there located.

The deceased's body was found lying on the floor in the north room, near the opening between that room and the vestibule. He was fully clothed and his eyeglasses were in place. An examination of the premises disclosed everything in order. Nothing had been stolen nor was there any indication of attempted theft or robbery. A valuable diamond ring which the deceased had been in the habit of wearing was still on his finger and other jewelry and some money was found upon his person and unmolested. Two electric lights, one in the vestibule and one in the living room were burning.

Two bullet wounds were found upon the body of deceased. One bullet had struck him in the right chest, passed through the body and had evidently struck the east wall of the vestibule and fallen to the floor where it was found. The other bullet had struck him in the left shoulder, passed nearly through the body and lodged therein. Both were steel jacketed .32 caliber bullets. On the floor by deceased's left side was found deceased's revolver, which he had been in the habit of carrying—a .38 caliber weapon using leaden bullets. It was fully loaded except for one empty cartridge found in the cylinder. On the floor of deceased's car was found a .38 caliber leaden bullet corresponding to those found in deceased's revolver. It had passed through the car door.

The body of deceased was examined by the coroner about noon on March 5th. The coroner testified that, in his opinion, deceased had been dead about thirty-six hours; that from the nature of the

wounds, death was not instantaneous, but probably occurred within an hour or so after the wounds were inflicted.

One R. E. Dugan operated a tourist camp, called Sleepy Hollow, on Highway 66, about two and a half miles northeast of Carthage. In the afternoon of March 3, 1934, Glenn Harmon, Powell, Moors and defendant came to that camp, in a Ford V-8 sedan. Harmon and Moors entered the building by a rear door and defendant and Powell drove on to Carthage where they found L. B. Harmon and, with him, returned to Sleepy Hollow. It appears that defendant did not then know L. B. Harmon. Seeking him, he went to the restaurant of one Purl Stemmons at Carthage and asked Stemmons if he was L. B. Harmon. Stemmons misunderstood him, thinking he had asked if he, Stemmons, knew Harmon, and answered affirmatively, whereupon the defendant told him ''The girls are out at the same place they were before.'' Stemmons informed defendant that he was not Harmon and called Harmon, who lived near. Harmon came, he and defendant held a short private conference and then, with Powell, returned to Sleepy Hollow. They parked their car behind the building, entered through the rear door and for two or three hours those three and Glenn Harmon and Moors were together and in close consultation, near the close of which L. B. Harmon was overheard to say to the others that he would meet them at nine-thirty on the road leading past his place, evidently referring to his place on the graveled road north of the Van Hoose residence. Another of the men, whose voice was not identified, asked, ''What about this layout?,'' to which Glenn Harmon replied, ''That is all right. I know all about that.'' The witness who overheard that scrap of conversation heard no mention of Van Hoose's name or of any intended crime. His suspicions were aroused by the conduct of the men, however, and he sent a note to a deputy sheriff, who came but left without taking any action. Shortly after the above-mentioned scrap of conversation was overheard L. B. Harmon, Powell and the defendant drove away to Carthage, returning soon with Napper, whom, it appears, they met and picked up, rather by accident than design, at Riddle's Cafe in Carthage. About seventhirty that evening the six men, together, left Sleepy Hollow in the Ford V-8 sedan, going thence, as appears from Napper's testimony, to Carthage.

According to the testimony of Napper (against whom the charge had been dismissed), he first met L. B. Harmon, whom he knew, and defendant and Powell, whom he had not previously known, at Riddle's Cafe about seven P. M., on said March 3rd. After a few drinks of beer, he suggested to L. B. Harmon that they take a ride to Joplin in Harmon's car. Harmon did not then have his car at hand. The four, L. B. Harmon, defendant, Powell and Napper, entered the Ford V-8 sedan and drove to Sleepy Hollow. They parked in the rear

of the building and joined Glenn Harmon and Moors, who were still there, in a rear room, where L. B. and Glenn Harmon, Powell, Moors and defendant conversed together in subdued tones for about fifteen minutes, Napper not hearing the conversation, and then all six left, going back to Riddle's Cafe, where Powell, Moors and Glenn Harmon alighted, and Napper, L. B. Harmon and defendant went to a filling station and got gasoline, paid for by Napper, as the other two did not seem to have any money. The three then returned to Riddle's Cafe. Soon thereafter L. B. Harmon told Napper to wait, he would get his own car and he and Napper would drive to Joplin. Presently L. B. Harmon's car, an Auburn sedan, was brought and, about eight-thirty. P. M., he and Napper left in it for, as Napper supposed, Joplin, going westward on Highway 66, in the direction of Joplin. After going west on said highway to where the graveled road above mentioned turns off to the south toward the Van Hoose residence, Harmon, who was driving, without explanation turned south on said graveled road and drove to its intersection with the Morgan Heights Road above mentioned, where he turned around, heading his car north, drove back north 100 or 150 feet, pulled to the left side of the road and stopped, leaving his lights on and his engine running. Napper's testimony indicates that, estimating, the point where Harmon thus stopped was probably about 300 feet from the Van Hoose house. Harmon said nothing but seemed to be watching for a car. In a few minutes the headlights of a car, coming from the north, appeared. As that car approached Harmon's car it slowed down noticeably, but, without stopping, passed. As it thus slowed down and passed Napper recognized it as the Ford V-8 sedan in which he had ridden previously during the afternoon and evening and recognized the occupants as defendant, Glenn Harmon, Moors and Powell. It "passed out of ear shot," in the direction of the Van Hoose house, and, so far as the testimony in this trial shows, Napper did not see or hear it any more. He did not know whether or not it stopped or whether or not it turned in at the Van Hoose residence. He did not look directly back after it passed to see what had become of it. Immediately after that car passed Harmon's parked car Harmon, without explanation, got out of his car and disappeared behind it, leaving Napper sitting in the car with the doors and windows closed and the engine running. Napper heard no shots. In about ten minutes Harmon returned, got into the car hurriedly, started it with a jerk and drove northward to Highway 66 and on to Joplin where he and Napper spent the remainder of the night. Napper did not again see the occupants of the V-8 sedan.

In this connection we note that on the first trial Napper had testified that when the V-8 sedan passed the parked Auburn "the noise of the car (V-8) was lost and then picked up a little bit later." His

testimony on the first trial left the impression that the V-8 had not stopped. In that respect his testimony on the second trial differs from that given at the first trial. We must deal here, of course, with the evidence in the instant case. Also, on the first trial Napper estimated the time at which the V-8 sedan passed the car in which he and Harmon were sitting at about nine o'clock. This time he estimated it as "sometime between eight-thirty and nine o'clock."

Mrs. Hackett, who lived just north of the Morgan Heights Road, a short distance northeast of the Van Hoose residence, heard shots—she did not say how many—"from the direction of the Van Hoose house," between eight and nine o'clock on the night of March 3rd. She could not fix the time more definitely. She looked out the window but saw nothing. At first she thought the noises she heard might be the backfiring of an automobile but said on this trial that she was quite certain they were shots. It appears from her testimony that there was a short interval—"not a very long time" but she could not tell exactly—between the first and second shots.

Defendant left Jasper County immediately after deceased was killed, going first to Kansas City, thence to Denver, Colorado, and from there to Los Angeles, California, where he was eventually located and arrested. When brought back to Missouri he at first denied having been in Jasper County on the night of March 3, 1934, but later, when shown a confession that Powell had made, admitted that he had been at Sleepy Hollow and at Carthage with the other parties above named but said he had gone directly from Carthage to Kansas City with Moors, Powell and Glenn Harmon. After leaving Jasper County that night he knew he was wanted for supposed complicity in the murder of Van Hoose and was trying to avoid arrest. For further details as to this and as to his movements after so leaving Jasper County see State v. Wolff, supra. There was evidence, also, tending to show that Glenn Harmon had been killed by officers in Los Angeles, in attempting to avoid arrest for some crime. We gather from the record that he had been killed before defendant's arrest.

Thus far the evidence on the second trial, except for the variations we have indicated, was substantially the same as on the first trial. On the second trial there was this additional evidence: Defendant was in the penitentiary,—lacking an appeal bond—pending determination of his appeal from the first conviction. One night he slashed his wrists with, as he said, suicidal intent. He was taken to the prison hospital and his wounds were dressed. On his return from the hospital he was interviewed by the officer then in charge, Luther Lasker. Lasker testified:

"A. I talked with him about it and he said that he was doing too much time; and I asked him how long he had been there and I believe he said since October or November, previous to that,— something

like that, I will say, and he said that he was doing life, and I asked him from where, and he said from Jasper County.

"Q. Now, at that time you didn't know him as being from Jasper County, or in this case? A. No, that is the first time I seen the boy to know who he was, or anything about it, and I asked him his name, and he told me his name was Wolff from Jasper County doing life, and he said he was figuring on getting rid of himself, and so on; he didn't want to finish doing that time, that he was doing life, and that the party that did the actual shooting, they killed him out in California. And I said, 'Do you mean Glenn Harmon,' and he said, 'Yes.' I says, then, 'You was with Glenn Harmon,' and he said, 'He was.'"

Lasker had known Glenn Harmon and knew that he was supposed to have been implicated in the murder of Van Hoose. When he had the above conversation with defendant it is clear that he and defendant were talking about the shooting of Van Hoose.

Defendant did not take the witness stand. Aside from some evidence tending to show that Napper was intoxicated during part of the time covered by his testimony—especially when he and Harmon left Carthage together in Harmon's car, supposedly to go to Joplin—defendant offered no evidence. He offered no evidence to explain his statement to Lasker or to deny having made that statement.

In our opinion on the former appeal, while conceding that the evidence raised a strong suspicion of defendant's guilt, we held the evidence insufficient because mere suspicion of guilt, even though strong, will not justify conviction (citing cases). We remanded the case in order to give the State the opportunity to produce, if possible, additional evidence. Additional evidence in the testimony of witness Lasker has been produced. But for that evidence, notwithstanding some variations in the testimony on the second trial from that given by the same witness on the first trial, we would still be inclined to hold the evidence insufficient, for reasons set forth in our former opinion. But with that additional evidence we believe the State made a case for the jury. Defendant's statement to Lasker indicates knowledge on his part that Glenn Harmon did the "actual shooting" and that he was with Glenn Harmon at the time the shooting was done. Other evidence offered by the State shows the presence of defendant, Glenn Harmon, Powell and Moors in the vicinity of the Van Hoose residence at about the time the killing must have been done. It is true the testimony of the coroner, Dr. Hogan, as to the time deceased had been dead when he examined the body would not precisely fit in with the time, estimated by Napper, when he said the Ford V-8 sedan passed L. B. Harmon's parked car going toward the Van Hoose residence. But these witnesses were estimating time rather than purporting to give it exactly, and Dr. Hogan's testimony

as to the time he thought deceased had been dead was necessarily an estimate, based upon the condition in which he found the deceased's body and his judgment, from the nature of the wounds, as to how long deceased may have lived after receiving the fatal wounds. As we said of this phase of the case on the former appeal, the time factor does not preclude the possibility that the V-8 sedan passed Harmon's car going toward the Van Hoose residence before deceased was shot. Defendant offered no explanation of his statement to Lasker. His flight, his subsequent moving from place to place to avoid arrest and his denial when first brought back to Jasper County that he had ever been in that county were circumstances for the consideration of the jury, as was also his continued denial that he had at any time been in the vicinity of the Van Hoose residence or on the graveled road leading past that place. He told the officers that he had gone directly from Carthage to Kansas City.

It is argued by appellant's learned counsel that no motive was shown—and the motive was not shown. It can only be surmised. The subject of the secret conferences among the alleged conspirators other than Napper—the only one used or who, perhaps, could be used as a witness by the State—was not disclosed. Defendant could have disclosed it but did not. Napper did not hear those conferences. The scraps of conversation among the five that were overheard did not reveal what was being talked about. It may be surmised, but under the evidence it is perhaps at best a surmise or inference, that the motive was robbery and that when Van Hoose's assailants were met by him at his door in fighting mood and shot him they became frightened and fled without pausing to accomplish their purpose. But we do not believe that proof of motive is absolutely necessary, though confessedly important where the evidence is wholly circumstantial, where, as here, the evidence points to a conspiracy and a killing done pursuant thereto and where, as in this case, there is evidence of statements made by the defendant tending to implicate him in the killing.

After careful consideration we have reached the conclusion that the evidence was sufficient to warrant submission of the case to the jury and to support the verdict. The judgment is affirmed.

PER CURIAM:—The foregoing opinion by COOLEY, C., in Division Two is adopted as the opinion of the Court en Banc. *Frank, Gantt, Leedy* and *Hays, JJ.,* and *Ellison, C. J.,* concur; *Collet* and *Tipton, JJ.;* dissent.